[No. D060636. Fourth Dist., Div. One. Jan. 31, 2012.]

T.W., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

## COUNSEL

Dependency Legal Group of San Diego and Valerie N. Lankford for Petitioner.

No appearance for Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips and Paula J. Roach, Deputy County Counsel, for Real Party in Interest.

Brian B. as Amicus Curiae, upon the request of the Court of Appeal.

## OPINION

**HUFFMAN, Acting P. J.**—T.W., a minor child, seeks review of a juvenile court order denying the petition of the San Diego County Health and Human Services Agency (Agency) to remove him from the home of his prospective adoptive parent under Welfare and Institutions Code[1] section 366.26, subdivision (n). He contends the juvenile court abused its discretion when it determined removal from the home was not in his best interests. The Agency joins T.W.'s petition, asserting the juvenile court did not have jurisdiction to review or override its executive decision under section 16514, subdivision (c), denying T.W.'s placement in the prospective adoptive parent's home.

Here, T.W.'s prospective adoptive father had previously adopted a highly traumatized foster child who was "active" to the gang suppression unit, had committed an escalating series of violent crimes, and was adjudged a ward of the juvenile court under section 602 in April 2010, before T.W.'s placement.

---

[1] Unless otherwise indicated, statutory references are to the Welfare and Institutions Code.

The Agency did not consider the ward's status to present a risk to T.W. until August 2011, eight months after he had been placed in the home of his prospective adoptive parent, and after T.W. was told he was to be adopted. The social worker and her supervisor then determined that section 16514, subdivision (c), which generally prohibits the placement of a dependent child with a section 602 ward, barred T.W.'s placement in the home, and sought his removal under section 366.26, subdivision (n).

We conclude that after a child has been placed in the home of a prospective adoptive parent, the Agency does not have the authority to change the child's placement when an alleged placement violation involves a discretionary determination by the social worker, and is not otherwise mandated by law. Further, although the juvenile court retains its clear grant of authority under section 366.26, subdivision (n), to determine whether removal from the home of the prospective adoptive parent is in the child's best interests, in exercising that authority it must give considerable weight to the statutory prohibition against placement with a section 602 ward, and the public policy against placement in a home in which a family member has a criminal history or substance abuse problem, as well as the social worker's determination the placement is not appropriate.

Here, notwithstanding the juvenile court's finding the testimony of the social workers and their supervisor was "contrived, unsupported, and not credible" concerning their reasons for seeking to remove the child from the home of the prospective adoptive parent, we conclude that the court did not give appropriate weight to the Legislature's goal of securing an adoptive home for a dependent child that is free from the influences of criminal activity and substance abuse, and providing maximum safety and security for the child. Under these circumstances, we conclude the court abused its discretion when it denied the Agency's petition to remove T.W. from the home of his prospective adoptive parent. Accordingly, we grant the petition and direct the juvenile court to review T.W.'s status on an expedited basis, consistent with its responsibility to ensure his adoption is completed as expeditiously as possible. (§ 366.3, subd. (a).)

## FACTUAL AND PROCEDURAL BACKGROUND

T.W., now eight years old, has been a dependent of the juvenile court since he was four years old.[2] During the reunification period, T.W. had five placements in less than two years. In December 2009, the Agency

[2] T.W.'s younger half sister was also a dependent of the juvenile court. However, because reunification efforts continued with her father, her case proceeded on a different timeline than T.W.'s case.

placed T.W. in the prospective adoptive home of a nonrelative extended family member (prospective adoptive mother), and in April 2010 he was freed for adoption. His adoptions social worker, Jaime Hills, said T.W. was a bright, happy child who was thriving in the home of his prospective adoptive mother.

On December 1, 2010, the Agency removed T.W. from the home of his prospective adoptive mother, who had been hospitalized for three weeks and did not contact the social worker to arrange appropriate respite care for T.W. The Agency placed T.W. at Polinsky Children's Center (Polinsky), and then in the licensed foster home of Mr. B. Mr. B. had been a foster parent for 15 years and previously had adopted a foster child, David, who had had a very traumatic background, and been adjudged a ward under section 602 in April 2010, when he was a teenager.

In February 2011, social worker Jaime Hills learned that David was in juvenile hall, but did not inquire further about David's circumstances. Hills informed her supervisor, Jorge De La Toba, of David's status. De La Toba was not concerned about T.W.'s placement because David was not in the home at that time. T.W. was doing well in Mr. B.'s home and the placement was stable. T.W. liked living with Mr. B. Mr. B. expressed an interest in adopting T.W. T.W. was very happy in the home and wanted to be adopted by Mr. B.

In early June, adoption applicant social worker Valerie Hills, who had approved Mr. B.'s adoptive home study for David, met with Mr. B. to begin the application process for an updated home study. Mr. B. told her that David was on probation, and they discussed his concerns about David's level of functioning and current gang involvement.

Jennifer Hancock, an adoptions social worker, was assigned the case in June, replacing Jaime Hills. At their first meeting, Hancock and Mr. B. had a disagreement about T.W.'s participation in football camp and the condition of T.W.'s tennis shoes. Mr. B. asked the Agency to assign another social worker to the case. At a meeting on August 1 to resolve the conflict, Mr. B. told Hancock and De La Toba that David was on probation. Hancock and De La Toba consulted foster care licensing, a separate division of the Agency, and learned for the first time of the statutory prohibition against placing a dependent child with a section 602 ward.

On August 4, Hancock and De La Toba filed a petition to remove T.W. from Mr. B.'s home. The petition alleged:

(1) Mr. B.'s 16-year-old son, David, was adjudicated a ward under section 602 for assault with a deadly weapon (not a firearm), battery and burglary.

Mr. B. did not notify foster home licensing about David's section 602 status. His home has been placed on "hold" for any foster home placements due to David's status;

(2) David had a history of "sexually reactive" behaviors.[3] After Mr. B. adopted David, he took David out of a treatment program for child sexual offenders (STEPS program). To maintain his foster care license, Mr. B. was required to obtain therapy for David and not allow him to share a room with Mr. B.'s foster children. The foster home licensing supervisor, Alicia Rogers, reported that David did not participate in therapy and Mr. B. was not in compliance with the corrective plan;

(3) Mr. B. did not follow through with services for the foster children placed in his home, and would not transport a foster child to therapy every week, requiring the assistance of the social worker on alternate weeks;

(4) T.W. and his foster brother reported that Mr. B. placed them in "lockdown" where they could not leave their bedrooms for two to three days. They were not allowed to play and could only leave their bedrooms when they went on outings with Mr. B.

(5) T.W. and his foster brother had inadequate clothing. In June, T.W. had on a pair of worn tennis shoes with no laces. He said he did not have other shoes. When the foster brother was removed from Mr. B.'s home, Mr. B. provided clothing that was too small for the child and extremely worn. He did not return all of the child's clothing.

When notified of the removal petition, Mr. B. asked Hancock to remove T.W. from his home immediately. Although he telephoned Hancock a short time later to tell her he did not want T.W. removed from his home, T.W. had already been detained at Polinsky. On August 5, Mr. B. filed an objection to removal and a request for status as T.W.'s prospective adoptive parent.

During the first week of August, an investigator with the foster licensing unit investigated the allegation that Mr. B. had placed T.W. and his foster brother in "lockdown" for several days. The investigator reported that T.W. did not describe the disciplinary measures as lockdown, but T.W. said that on one occasion, after he returned home from the Boys and Girls Club, he was restricted to his bedroom. The investigator also spoke to Mr. B. and other foster children who had been placed in the home, but there were no reports of

---

[3] In April 2007, David, then 12 years old, sexually assaulted his 10-year-old sister while she was sleeping. He also had sexual relations with a 14-year-old female cousin after she asked him if he wanted to pay her for sex. David reported that he had hand-to-genital contact with his cousin in 2005.

excessive discipline. The investigator determined the report of excessive discipline was inconclusive, which meant there was not sufficient evidence to substantiate the allegation.

On August 16, David was detained in juvenile hall on new charges of robbery, burglary, possession of stolen property, willful cruelty to an elder and assault with a firearm. He was later sentenced to a custodial program not to exceed 480 days in custody.

On August 17, the juvenile court designated Mr. B. as T.W.'s prospective adoptive parent. A hearing on removal was held on September 1, 6, 9 and 23, 2011. The court admitted in evidence the Agency's reports and took judicial notice of David's juvenile court file. After the hearing began, the Agency reported that foster home licensing decided to recommend revocation of Mr. B.'s license because it could not exclude David from the home, and David's criminal activity would be detrimental to foster children. The Agency placed a hold on Mr. B.'s foster home, precluding foster children from being placed there, and denied Mr. B.'s adoptive home study. The Agency initiated a home study of the out-of-state adoptive home of T.W.'s younger half sister, whose prospective adoptive parents had indicated an interest in adopting T.W. as well.

Social worker Jennifer Hancock testified she knew David had been in juvenile hall when she received the case in June 2011, but did not know David was on probation. At that point, she did not have any concerns about T.W.'s placement in Mr. B.'s home. She was not familiar with section 16514, subdivision (c). However, upon discovering that David was on probation, she and De La Toba decided to remove T.W. from the home because she believed that he would be at risk in the placement. T.W. was eight years old. He was doing well and did not have any behavioral problems. In contrast, David was 16 years old. He was "active" to probation and the gang suppression unit for violent crimes. David had substance abuse issues and a history of "sexually reactive" behavior.

Jaime Hills testified she had visited T.W. once or twice a month while she was his social worker. Jaime Hills thought Mr. B.'s home was a good placement for T.W. T.W. was happy and his needs were met. Jaime Hills never noticed anything amiss about T.W.'s clothing. At the end of the day he was a little dirty and messy, but nothing out of the ordinary for a child his age. Jaime Hills did not have any problems with Mr. B. He always complied with her requests. With respect to discipline, Mr. B. would remove privileges from the children. T.W. never mentioned the word "lockdown."

Jaime Hills testified that when she learned that David was in juvenile hall, she did not believe he presented a risk to T.W. because he was not in the

home. She did not know about the general rule prohibiting the placement of dependent children with section 602 wards. Had she known about David's history and the licensing issues, she would not have placed T.W. in Mr. B.'s home. Jaime Hills now believed it was not appropriate to place T.W. in a home with an older, sexually reactive child because T.W. had displayed sexualized behaviors and was susceptible to suggestion.[4]

De La Toba supervised social workers Jaime Hills and Jennifer Hancock. After learning that David was in juvenile hall, he did not have any concerns about T.W.'s placement. De La Toba said being in juvenile hall was not the same as being adjudged a section 602 ward. He and Jaime Hills believed it was appropriate for Mr. B. to proceed with T.W.'s adoption.

After Mr. B. informed them that David was on probation, De La Toba and Hancock determined that the home was not suitable for T.W. In addition to the statutory problem, they had concerns about inappropriate discipline and the risk to T.W. from David's sexually reactive behaviors. De La Toba acknowledged he knew the investigator had determined the allegation of inappropriate discipline was inconclusive, but asserted that an inconclusive finding did not mean that the inappropriate discipline did not occur.

Alicia Rogers, the social worker supervisor for foster home licensing, said she told Hancock that T.W.'s placement in Mr. B.'s home violated state law and public policy, and that Hancock and the placement coordinator would need to decide whether to remove T.W. from Mr. B.'s home. Hancock asked Rogers about a February 2009 complaint that Mr. B. had removed David from the STEPS program. To maintain his foster home license, Mr. B. had agreed to obtain therapy for David as a "plan of correction." The investigator reported that Mr. B. set up a therapy session in March 2009 for David but Rogers did not have any paperwork in the file to indicate David was in therapy.

Rogers testified she told Hancock that David did not participate in therapy and did not complete the plan of correction. When asked whether that was a true finding, Rogers replied, "We don't have any evidence, so I can't speculate." She explained that when the Agency did not receive the proper paperwork, its policy and practice was to assert the person did not comply with the plan of correction, even though it knew factually the person may have complied with the plan. Here, the file did not have the proper paperwork to prove the plan of correction was completed.

---

[4] In June 2009, five-year-old T.W. and his three-year-old sister engaged in what the social worker then characterized as "an incident of sexual exploration" between the siblings. The Agency also reported there was an allegation in November 2009 that T.W. was touching and kissing the penis of a five-year-old boy.

Fatima Abdullah was the adoptions social worker in David's case. Before David was adopted, Mr. B. took him to all his treatments for sexually reactive behavior. When the adoption was finalized, Abdullah recommended that David continue in treatment. She did not specifically recommend the STEPS program. When Abdullah placed David in Mr. B.'s home, there were several other foster children in the home. She was not concerned about David's history of sexually reactive behavior. Abdullah had cases in which she had approved the placement of dependent children and section 602 wards in the same home.

Marilyn Lewis provided weekly therapy to T.W. from January to March 2011. The goal of therapy was to reduce T.W.'s sexualized behaviors and give him the tools to manage the adjustments and losses he had experienced. Lewis terminated therapy because T.W. was doing well and did not present with any problems. She was not aware that there was another child in the home with a history of sexually reactive behavior. Lewis said T.W. appeared to be well groomed and well cared for. Except for a short time when he had transportation problems, Mr. B. transported T.W. and another foster child to and from therapy.

Valerie Hills, who had approved Mr. B.'s first adoptive home study and was assisting him with his application for an updated home study, knew that David had a history of sexually reactive behavior. There were three or four other foster children in Mr. B.'s home at the time she conducted the home study. She did not receive any negative reports about Mr. B.'s parenting at that time. Valerie Hills testified that she did not have any concerns about T.W.'s proposed adoption when she first learned David was on probation. From working with Mr. B. in the past, Hills believed he would be able to manage the situation.

Valerie Hills denied the current adoptive home study on September 7, believing David's issues would interfere with Mr. B.'s ability to meet T.W.'s needs. David needed a lot of supervision, structure, love, and one-on-one attention and his gang involvement also was a risk factor for a younger child. Further, Valerie Hills knew of several referrals concerning Mr. B.'s lack of cooperation with service providers, and there were recent allegations the children were harshly punished and disciplined in his home.

The juvenile court found the Agency did not meet its burden to show that removal from the prospective adoptive home was in T.W.'s best interests. The court found that Mr. B. was a long-standing, well-regarded foster parent who demonstrated a clear commitment to the children who were placed with him. T.W. had been thriving in the home for eight months. He was told that Mr. B. was going to adopt him. The court found that Jaime Hills and De La

Toba knew of David's status in February 2011 and did not have any concerns about T.W.'s safety in Mr. B.'s home.

The juvenile court stated the evidence indicated the Agency set out to build a case against Mr. B. after it discovered it had made a mistake by not assessing David's status earlier. The court found that much of the documentary evidence submitted in support of removal by Hancock and De La Toba was exaggerated or untrue. The court further found that the testimony of De La Toba, Jaime Hills and Valerie Hills as to the concerns they had about T.W.'s placement in Mr. B.'s home was "contrived, unsupported, and not credible." In a thorough review of the evidence, the court rejected the Agency's claims that Mr. B. improperly disciplined T.W.; T.W. did not have proper clothing and was not adequately groomed; David's history of sexually reactive behavior presented a risk to T.W.; Mr. B. did not cooperate with service providers; and Mr. B. did not comply with foster home licensing requirements.

With respect to the prohibition against placing a dependent child with a section 602 ward, the court stated the Legislature did not intend for an alleged license violation to require automatic removal of a child in a preadoptive placement without an analysis of the child's best interests under section 366.26, subdivision (n). The juvenile court found that the exception under section 16514, subdivision (c), applied. The evidence showed that Mr. B. was able to meet the specific needs of each child. David was to be out of the home for the next year or more, which would allow Mr. B. to focus on T.W. When David returned to the home, he and T.W. would have common needs for close supervision, stability, hands-on parenting and advocacy. The court ordered the Agency to return T.W. to Mr. B.'s home, either as a nonrelative extended family placement or as a licensed foster home placement. It also ordered the Agency to reopen the adoptive home study in view of its findings and orders.

The Agency asked the juvenile court to stay its order returning T.W. to Mr. B.'s home. The Agency argued Mr. B.'s foster home license was on hold or pending revocation, and T.W.'s placement in the home would be illegal. Further, the juvenile court did not have the authority to ask the Agency to reopen the adoptive home study, which had been denied.

The juvenile court acknowledged it had no control over the Agency's licensing and adoptive home study processes, but encouraged the Agency to reconsider the licensing hold and the recommendation to revoke Mr. B.'s foster care license. The court granted the request for a stay of its ruling.

T.W. and the Agency petition for review of the juvenile court's order under California Rules of Court, rules 8.454 and 8.456. They request that this court

reverse the order denying the Agency's petition to remove T.W. from the home of his prospective adoptive parent, Mr. B. This court issued an order to show cause, the Agency responded, and the parties waived oral argument.

On January 4, 2012, this court asked minor's counsel and the Agency to inform it of T.W.'s current status. The parties report that T.W. was removed from a foster placement at the end of December 2011, and placed at Polinsky, where he remains.[5] T.W. expressed a desire to live with his younger sister. The Agency has not moved forward with a decision about T.W.'s next adoptive placement, pending the outcome of this proceeding.

This court afforded Mr. B. an opportunity to respond to the petition and response for extraordinary writ. He filed his informal response in this court on January 18, 2012. Mr. B. contends the juvenile court correctly determined it was not in T.W.'s best interests to be removed from his home, and still wishes to adopt T.W. Mr. B. reports his foster home license has not been revoked and the Agency recently placed two children in his home.

DISCUSSION

I

*ISSUES PRESENTED FOR REVIEW*

T.W. contends the juvenile court abused its discretion when it found that his removal from Mr. B.'s home was not in his best interests. He asserts the court's ruling transforms him from an otherwise adoptable child into a legal orphan, and argues the ruling violates foster care placement restrictions under section 16514, subdivision (c).

The Agency contends the juvenile court erred as a matter of law because it did not have jurisdiction to review or override the Agency's executive decision denying T.W.'s placement in Mr. B.'s foster home. The Agency argues it should not have proceeded under section 366.26, subdivision (n), but instead should have filed a report informing the juvenile court why it was removing T.W. from Mr. B.'s home. Alternatively, the Agency argues if the juvenile court is authorized to override its determination concerning the suitability of the foster home placement, the court abused its discretion when it placed T.W. with someone who could not be approved for adoption. The Agency contends T.W.'s best interests are not served by "placement back" into Mr. B.'s home due to T.W.'s and David's histories of sexualized behaviors.

---

[5] This is T.W.'s *11th* placement since he was detained in protective custody in February 2008.

The parties do not challenge the juvenile court's rejection of the other grounds for removal, including inappropriate discipline, inadequate grooming and clothing, Mr. B.'s lack of cooperation with service providers and lack of compliance with foster home licensing requirements. Further, the record amply supports the juvenile court's findings, thoroughly explained on the record, as to those issues. With respect to the Agency's argument that removal was in T.W.'s best interests on the sole ground that he and David both had histories of sexually reactive behavior, we conclude the court did not abuse its discretion when it found that the incidents involving David were more than four years old and there was no evidence of current risk to T.W. (See, e.g., *In re Maria R.* (2010) 185 Cal.App.4th 48, 68 [109 Cal.Rptr.3d 882] [risk of sexual abuse to a sibling not established when there is no evidence to show a perpetrator of sexual abuse on a female child is in fact likely to sexually abuse a male child].)

■ Thus, the central issue in this proceeding is the conflict between a statute that gives the executive agency the authority to determine the suitability of a child's placement in foster care and a statute that gives the juvenile court the authority to decide whether removal from the home of a prospective adoptive parent is in the child's best interests.[6] This is a question of law, which we review de novo. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 [33 Cal.Rptr.3d 337].) "[W]e look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law. [Citations.] The language is construed in the context of the statute as a whole and the overall statutory scheme, and courts give significance to every word, phrase, sentence and part of an act in pursuing the legislative purpose." (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 57 [81 Cal.Rptr.3d 918].)

II

*THE STATUTORY FRAMEWORK*

■ The purpose of the California dependency system is to provide maximum safety and protection for dependent children, and to ensure their

---

[6] With respect to the parties' assertion Mr. B.'s home "cannot be approved for adoption," we note that this ruling is subject to administrative review, and the Agency has the discretion to provide the prospective adoptive parent with additional support and supervision instead of recommending removal from the home. (Fam. Code, § 8735.) The juvenile court found that the denial of the adoptive home study was based on inconclusive allegations of excessive discipline and the premise that David's needs would require such attention that Mr. B. would not be able to adequately meet T.W.'s needs, when in fact the social workers consistently reported that Mr. B. had been meeting T.W.'s needs and T.W. was very happy in the home. This issue also raises questions about the authority of the juvenile court to direct the Agency to reconsider its denial of an adoptive home study. However, because we decide the writ on other grounds, we do not reach this issue here.

physical and emotional well-being. (§ 300.2.) The Legislature has declared it is state policy to facilitate the proper placement of every child in residential care in a placement that is in the best interests of the child. (Health & Saf. Code, § 1501.1, subd. (a).) In placing a child in out-of-home care, the Legislature directs an agency to give particular attention to the individual child's needs, the ability of the facility to meet that child's needs and the needs of the other children in the facility, the licensing requirements as determined by the licensing agency, and the impact of the placement on the family reunification plan. (*Ibid.*) Children with varying designations and varying needs, except as provided by statute, may be placed in the same licensed foster family home. (Health & Saf. Code, § 1501.1, subd. (d).)

█ In furtherance of this policy, statutes governing out-of-home care prohibit the Agency from approving a foster care home or a relative home if an adult in the home has a disabling criminal conviction. (Health & Saf. Code, § 1522.) An adult's nonexempt disqualifying criminal conviction requires denial of his or her application for a foster home license. (*Los Angeles County Dept. of Children & Family Services v. Superior Court (Cheryl M.)* (2003) 112 Cal.App.4th 509, 520 [5 Cal.Rptr.3d 182].) Moreover, the prohibition in section 361.4, subdivision (d)(2), against placing a dependent child in a home where the child would have contact with an adult who has been convicted of a crime, other than a minor traffic violation, is *mandatory.* (*Los Angeles County Dept. of Children & Fam. Services v. Superior Court (Valerie A.)* (2001) 87 Cal.App.4th 1161, 1166–1167 [105 Cal.Rptr.2d 254]; *Los Angeles County Dept. of Children & Family Services v. Superior Court (Sencere P.)* (2005) 126 Cal.App.4th 144, 151 [24 Cal.Rptr.3d 256]; see Health & Saf. Code, § 1522.)

Similarly, section 16514, subdivision (c), prohibits an agency from placing a child adjudged a dependent of the juvenile court under section 300 with any minor adjudged a ward of the juvenile court under section 602 unless the social worker determines the home has a program that meets the specific needs of the dependent child being placed, and there is a commonality of needs with the other minors in the home. (§ 16514, subd. (c).) While this statute does not mandate denial of placement, it presumes that placement with a section 602 ward is not suitable for a dependent child.

The Legislature last amended section 16514, subdivision (c), in 1988. (Stats. 1988, ch. 1142, § 14, p. 3667, eff. Sept. 22, 1988.) We find no previous cases, published or unpublished, that cite to section 16514. The lack of appellate cases under section 16514, subdivision (c), suggests the social worker's determination that the exception does or does not apply is prospective, and the placement of a dependent child with a section 602 ward does not ordinarily occur without the social worker's prior approval. (See § 16514,

subd. (c) [referring to "the minor being placed or detained" in the home].)
This is consistent with the executive authority of a child welfare agency to
approve and select an appropriate foster home for a dependent child consis-
tent with state law, administrative regulation and public policy.

Unlike a relative home placement, there is no statutory provision that
allows the juvenile court to override the Agency's selection of an appropriate
foster home for a dependent child. (See § 361.3 [when determining whether
placement with a relative is appropriate, the social worker *and the court* shall
consider a variety of factors].) As the Agency acknowledges, the juvenile
court may review the Agency's placement decision for an abuse of discretion;
that is, it assesses whether the Agency " 'acted arbitrarily and capriciously,
considering the [child's] best interests.' " (*In re Esperanza C.* (2008) 165
Cal.App.4th 1042, 1059 [81 Cal.Rptr.3d 556], quoting *Department of Social
Services v. Superior Court* (1997) 58 Cal.App.4th 721, 734 [68 Cal.Rptr.2d
239].) "The provision for judicial review of the appropriateness of the
agency's placement of the minor indicates a legislative assessment that the
agency, despite its expertise, might on occasion abuse its discretion and
therefore should not be given carte blanche in its placement decisions."
(*Department of Social Services v. Superior Court, supra,* at p. 734.)

In 2005, to strengthen the juvenile court's oversight and to protect the
stability of children after parental rights are terminated, the Legislature
enacted Senate Bill No. 218 (2005–2006 Reg. Sess.). (§ 366.26, subd. (n);
Stats. 2005, ch. 626, p. 4666, eff. Jan. 1, 2006.) Section 366.26, subdivi-
sion (n), represents "a paradigm shift in the standards to be applied to agency
decisions in the narrow category of posttermination removal of children from
designated prospective adoptive placements and gives to the court the wide
discretion previously afforded the adoption agencies to determine whether the
placement is in the best interest of the child." (*State Dept. of Social Services v.
Superior Court* (2008) 162 Cal.App.4th 273, 285–286 [76 Cal.Rptr.3d 112];
see *Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1341 [52
Cal.Rptr.3d 519].)

In enacting section 366.26, subdivision (n), the Legislature intended to
"limit the removal of a dependent child from his or her caretaker's home after
parental rights are terminated, if the caretaker is a designated or qualified as a
prospective adoptive parent, as defined, in order to 'protect the stability and
best interests of vulnerable children.' " (Assembly Com. on Judiciary, com.
on Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended June 2, 2005, p. 5.)
The legislation was designed to correct the " 'nearly complete, unchecked
authority' " appellate courts had given to a child welfare agency to decide a
dependent child's adoptive placement after termination of parental rights.
(Sen. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg.

Sess.) as amended Apr. 7, 2005, p. 2, citing *In re Harry N.* (2001) 93 Cal.App.4th 1378 [114 Cal.Rptr.2d 46].)

The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n)(3)(B).) If a prospective adoptive parent objects to the child's removal from the home, the Agency must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests. This standard applies whether the Agency has filed a notice of intent to remove the child under section 366.26, subdivision (n)(3), and the child is still in the home of the prospective adoptive parent, or the Agency has removed the child from the home on an emergency basis under 366.26, subdivision (n)(4), as here. Under either circumstance, the juvenile court determines whether the proposed removal of the child from the home is in the child's best interests, and *the child may not be removed from the home unless the court makes that finding.* (§ 366.26, subd. (n)(3)(B).)

Petitioners characterize the juvenile court's action as a "placement" of the child with the prospective adoptive parent, and assert T.W. could not be "placed back" with Mr. B. because the placement was now illegal. We disagree. T.W.'s emergency removal from Mr. B.'s home did not transform removal under section 366.26, subdivision (n), into a placement. "[W]e look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law." (*In re Adrianna P., supra,* 166 Cal.App.4th at p. 57.) The words "removal" and "placement" have different meanings and we presume the Legislature did not intend to use them interchangeably. (See, e.g., *Los Angeles County Dept. of Children & Family Services v. Superior Court (Cheryl M.), supra,* 112 Cal.App.4th at pp. 519–520 [distinguishing between an existing placement and a new placement].)

Under section 366.26, subdivision (n), the court must decide whether to *remove* the child from the home of a prospective adoptive parent regardless of whether the Agency has detained the child on an emergency basis or seeks to remove a child who remains in the home pending the outcome of the hearing. (*State Dept. of Social Services v. Superior Court, supra,* 162 Cal.App.4th at pp. 285–286 [with the exception of notice requirements, the same hearing procedures apply to both types of removal and the child may not be removed from the designated prospective adoptive parent unless the court finds that removal is in the child's best interests].)

III

*THE AGENCY'S AUTHORITY TO PLACE A CHILD IN A
NEW FOSTER CARE OR ADOPTIVE PLACEMENT IS
LIMITED AFTER A CHILD HAS BEEN PLACED IN THE
HOME OF A PROSPECTIVE ADOPTIVE PARENT*

██ The Agency asserts it has the authority to remove T.W. from the licensed foster home of his prospective adoptive parent after it determined the placement was made in error in contravention of section 16514, subdivision (c). We disagree. Because T.W. was placed in a prospective adoptive home, the Agency no longer had the authority to remove him from the home without a finding by the juvenile court that removal was in T.W.'s best interests. We agree with the juvenile court's observation that had the Agency determined the placement was not appropriate in February when the social worker and her supervisor became aware of David's status (or in Jan. when the annual foster home assessment on Mr. B.'s home should have been completed, but was not), the Agency could have exercised its executive authority to select another foster or adoptive placement for T.W. However, as the juvenile court noted, by the time the Agency decided to remove T.W., he had been living in Mr. B.'s home for eight months. T.W. was, by all accounts, thriving at home and in school. Mr. B. had initiated an updated adoptive home study, and T.W. was in agreement with the planned adoption.

Under those circumstances, the Agency cannot use section 16514, subdivision (c), to strip the juvenile court of its authority to decide whether removal from the home of the prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n).) Thus, the Agency's determination it could not place T.W. in Mr. B.'s home, under section 16514, subdivision (c), is not controlling here.

██ Although an agency has exclusive care and control of the child at all times until a petition for adoption is granted (§ 366.26, subd. (j)), the Legislature has determined that it is the province of the judicial branch to decide whether removal from the home of a prospective adoptive parent is in the child's best interests. (*Wayne F. v. Superior Court, supra,* 145 Cal.App.4th at p. 1341; accord, *State Dept. of Social Services v. Superior Court, supra,* 162 Cal.App.4th 273, 285–286.) The juvenile court is also charged with the responsibility "to ensure that the [child's] adoption . . . is completed as expeditiously as possible." (§ 366.3, subd. (a).) The core function of both the agency and the juvenile court after parental rights have been terminated is to ensure the child's prompt adoption in a safe, stable, loving home. (§§ 366.26, subds. (j), (n), 361.3, subd. (a).) Thus, juvenile court review of a social worker's decision that the child's placement is not appropriate, after the child

has been placed with a prospective adoptive parent, does not encroach on executive powers solely belonging to the agency. (Cal. Const., art. III, § 3 ["[p]ersons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution"]; see generally *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1102 [29 Cal.Rptr.3d 249, 112 P.3d 636] [each branch of government has certain core functions that may not be usurped by another branch]; *In re Esperanza C., supra,* 165 Cal.App.4th at p. 1060 [there is no constitutional or statutory provision that expressly states the juvenile court may not review agency action for abuse of discretion]; *Case v. Lazben Financial Co.* (2002) 99 Cal.App.4th 172, 184 [121 Cal.Rptr.2d 405] [the activities of one branch of government are not immune from oversight by another branch].)

IV

*IN CONSIDERING T.W.'S BEST INTERESTS, THE*
*JUVENILE COURT DID NOT GIVE APPROPRIATE*
*WEIGHT TO DAVID'S CRIMINAL HISTORY*

We defer to the juvenile court's findings of fact and assessment of the credibility of witnesses. Our discussion is premised on the court's findings that the Agency's other reasons to remove T.W. from Mr. B.'s home were pretextual or not proved. We nevertheless conclude that the court did not give appropriate weight to the indisputable fact David had committed a series of increasingly violent offenses, was active to the gang suppression unit and had a substance abuse problem. If David were an adult, his offenses would have been considered disabling criminal convictions sufficient to prevent T.W.'s placement in that home as a matter of law. Although the Agency's performance was fraught with error, and distressing to this court, the record shows that adoption in a home in which a member of the family is having serious problems is not in T.W.'s long-term best interests.

In view of T.W.'s age and the fact this is his second failed adoptive placement in two years, this is not an easy decision. However, the juvenile court's decision to stay its ruling is inconsistent with its best interests finding, and has resulted in T.W.'s interim temporary placement for a significant period of time. We also note that T.W., through counsel, is a petitioner in this action and seeks relief from the order denying the Agency's petition to remove him from Mr. B.'s home. Time is of the essence in this case. Further conflict between the executive and judicial branches does not serve the interests of this child in an expeditious placement in a safe, stable and secure adoptive home.

## DISPOSITION

Let a writ issue directing the juvenile court to vacate its order placing T.W. with Mr. B. The court is directed to review the child's status on an expedited basis, consistent with its responsibility to ensure the child's adoption is completed as expeditiously as possible. (§ 366.3, subd. (a).) This opinion will be final as to this court seven days from the date of filing of the opinion. (Cal. Rules of Court, rule 8.490(b)(3).)

McIntyre, J., and Aaron, J., concurred.