Filed 6/23/14  In re Eric L. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ERIC L., a Person Coming Under the Juvenile Court Law. | B255694 (Los Angeles County Super. Ct. No. CK92816) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; DORA F., Real Party in Interest. | |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.454.)  Julie F. Blackshaw, Judge.  Petition denied.

Office of the County Counsel, John F. Krattli, County Counsel, Dawn R. Harrison, Assistant County Counsel, Tyson B. Nelson and Peter Ferrera, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Law Offices of Katherine Anderson, Jennifer Pichotta and Margaret Beare for Real Party in Interest Dora F.

Children's Law Center of Los Angeles, CLC 1, and Cynthia Widitora for Minor.

_____

The Los Angeles County Department of Children and Family Services (DCFS) petitions for extraordinary relief pursuant to California Rules of Court, rule 8.454, et seq. It seeks review of an order returning a child to his prospective adoptive parent after DCFS removed him on an emergency basis.  (Welf. & Inst. Code, § 366.26, subd. (n)(3) & (4).)[1]  DCFS asserts the juvenile court's decision was an abuse of discretion.  We deny the petition.

**FACTS AND PROCEDURAL HISTORY**

This matter involves a young boy, Eric L., now aged four.  On March 27, 2012, Eric and his younger brother, Steve F., then aged four months, were detained from their mother and Steve's father.  A section 300 petition was sustained on allegations the couple repeatedly engaged in domestic violence in front of the children and failed to protect them with proper restraints in the car.  Ultimately, the court terminated parental rights as to both boys because mother and Steve's father failed to satisfactorily complete their reunification case plans, and Eric's father was whereabouts unknown throughout the proceedings.[2]

As of June 1, 2012, the boys were placed with their maternal grandmother (grandmother).  Because mother was not allowed unsupervised contact with either child, grandmother was instructed on how to monitor visits.  Grandmother agreed she would

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Eric's father is currently appealing denial of his attempt to reenter the proceedings. He contends he was in Los Angeles throughout the reunification period, but DCFS did not do enough to find him so that he could participate.

remain within hearing and seeing distance at all times that mother was with the children, and would call a social worker if she had any questions about what to do. Grandmother thereafter provided a safe home for the boys, who thrived in her care. As of September 20, 2013, DCFS found grandmother to be compliant with all case plan activities, and it had no concerns about her ability to care for and supervise the children. DCFS approved an adoptive home study for grandmother, and recommended that she be allowed to adopt the children. Upon termination of parental rights, the juvenile court designated grandmother as the boys' prospective adoptive parent.

Within a month of that designation, DCFS gave notice that Eric was removed from grandmother's custody on an emergency basis. It reported that on January 6, 2014, Steve was pronounced dead due to severe physical abuse by a family friend, and asserted grandmother's neglect in leaving Steve with the family friend endangered Eric. During an investigation of the incident, grandmother told several different stories about what had happened, initially trying to conceal the fact that she had given Steve to mother on an unmonitored basis, and it was mother who left Steve with the family friend. On February 18, 2014, grandmother filed an objection to the emergency removal. She further applied for designation as Eric's de facto parent, which was granted. DCFS rescinded approval of grandmother's home as an adoptive placement. On April 10 and 11, 2014, grandmother's objection to Eric's removal came on for hearing.

Grandmother testified to the events surrounding Steve's death, and the juvenile court admitted several reports into evidence that fleshed out the story. Grandmother had scheduled a medical appointment for 9:00 o'clock on January 4, 2014. That morning, she tried to find someone to care for the children but could not. She called mother for assistance, even though grandmother knew mother worked seven days a week. They arranged for grandmother to take Eric to the appointment with her, and for mother to pick up Steve and drop him with a family friend, Tania O., who lived with E.M. Grandmother began looking for Steve at approximately 4:00 o'clock that afternoon. At 5:00 or 6:00 o'clock, she and mother drove to Tania's home, but no one was there. Later, Tania texted

3

a picture of Steve, indicating he was safe. At 11:00 o'clock, Tania called mother and asked that Steve be allowed to stay the night. Mother and grandmother agreed, though the idea worried grandmother. On January 5, 2014, mother and grandmother again telephoned Tania. She did not respond until 11:00 o'clock that morning, when she called mother to say that Steve was taken to the hospital by ambulance. Steve was brain dead when he arrived at the hospital due to severe inflicted trauma. He was pronounced dead the next day. Authorities arrested E.M. for the abuse.

Grandmother testified that she initially lied about what happened, suggesting she had given Steve to Tania and E.M. directly, because she was afraid that Eric would be taken from her if the social workers knew she had allowed mother unmonitored contact. Grandmother insisted she had always monitored mother's visits with the children in the past, and the day she had her medical appointment was the first time she allowed unmonitored visitation. Grandmother was aware that mother had dropped Steve off with Tania. Though she did not have Tania's address or contact information, she consented because Tania was familiar to her, as Tania had lived with mother in the past, had been in a relationship with Steve's uncle so was like a paternal aunt, and had cared for Steve and Eric before DCFS became involved. Grandmother had also trusted Tania to housesit for her at one point. Grandmother did not really know E.M., but left Steve in Tania's care, not his.

Grandmother stated that if Eric were returned to her, she would have his regular, approved babysitter watch him while she was at work. She felt responsible for Steve's death and found what she was going through to be "too much." If she had it to do over again, grandmother would not have gone to the doctor, or would have taken Steve with her. Grandmother acknowledged that when the children were first detained from mother, she did not think mother was a risk to the children. Nevertheless, she believed it was wrong to allow mother an unmonitored visit that day, and was willing to cut off all contact with mother if Eric were returned to her care. She also believed it was wrong to

lie to the social workers and police. Grandmother would enroll in therapy if required, and was already trying to get into parenting classes recommended by a social worker.

The parties stipulated that if Eric were called to testify he would state that grandmother is like a mother to him and has been taking care of him for as long as he can remember. He loves her and wants to return home. She took good care of him while he was with her. Though she was available, DCFS did not call mother to testify. Instead, a supervising social worker cited to statements mother made to law enforcement that she often had unmonitored contact with the boys, particularly Steve. Those statements caused the social worker to doubt grandmother's claim this was the only instance of unmonitored access.[3] Moreover, grandmother's having lied to law enforcement and DCFS about Steve's death rendered her untrustworthy, and so not a safe candidate to protect Eric. DCFS was also unable to verify statements grandmother continued to make about taking Steve for treatment of bronchitis, which was a condition used in some of the early, false statements about the events to explain why Steve needed to go to the hospital. In short, DCFS thought grandmother was still lying.

The juvenile court found that DCFS had not carried its burden under section 366.26, subdivision (n) to show that it would be in Eric's best interest to be removed from grandmother's home. The court concluded that since Eric's removal, the circumstances had changed sufficiently to warrant returning Eric to grandmother. Grandmother had corrected her behavior by admitting she made mistakes in allowing

---

[3] A report detailing those statements was admitted into evidence. It indicates that just after Steve's death, mother told a detective she often helped grandmother care for the children on an unmonitored basis because they were too much for grandmother. Mother and grandmother later denied the accuracy of those statements.

In its petition, DCFS recites further statements mother made to social workers just after Steve's death, claiming that she was the one who arranged child care for Steve on January 4, 2014, that she made arrangements for Steve to be returned to her care at the end of the day, and that she told grandmother Steve would be staying with her overnight, not Tania. However, the report containing those statements was *not* admitted into evidence.

Steve to have unmonitored contact with mother and in lying to police and the social workers. The court believed grandmother had learned her lesson through Steve's tragic death, and was committed to doing whatever DCFS required going forward. Moreover, Eric had lived with grandmother his whole life, and there was no indication he was not safe in her care. He wanted to return to grandmother. The court did not want to increase the trauma Eric had suffered in the loss of his brother by also causing him to lose his family. Thus, the court returned Eric to grandmother's care and ordered that any visits with mother be monitored by a DCFS-approved monitor, excluding grandmother or Tania.

This petition followed. It is opposed by grandmother and counsel for Eric. DCFS separately brought a petition for writ of mandate challenging the order and seeking an immediate stay. (*Los Angeles County Department of Children and Family Services v. Superior Court* (B255530, petn. pending). This court issued the stay, and decided to review the matter on the full record that would be produced in support of the instant petition.

## DISCUSSION

When a child is removed from the custody of a prospective adoptive parent, subdivision (n) of section 366.26 controls. That subdivision requires that if the removal is challenged, DCFS must demonstrate it is in the best interest of the child to alter his or her placement. (§ 366.26, subd. (n)(3) & (4).) In the case of an emergency removal, the juvenile court should consider not only the factors that led to removal, but the circumstances present at the time of the subsequent hearing. (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 287 (*State Dept. of Social Services*).) The court's determination of the child's best interest is reviewed for an abuse of discretion. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 34 (*T.W.*); *State Dept. of Social Services*, *supra*, at p. 287.) That is, the appellate court will defer to the juvenile court's findings of fact and assessments of witness credibility, and will not disturb the juvenile court's ruling unless it

6

was arbitrary, capricious or patently absurd.  (*In re Stephanie M.*, *supra*, at p. 318; *T.W.*, *supra*, at p. 47.)

The juvenile court's determination of Eric's best interest in this case cannot be described as arbitrary, capricious or absurd.  It is true that DCFS had reason to remove Eric from grandmother's care after Steve died.  Grandmother had failed to plan ahead to secure proper child care for the morning of her scheduled appointment.  She did not call a social worker when she had a problem, as promised.  She allowed mother some measure of unmonitored contact with Steve in violation of court orders.  Grandmother further participated in or ratified a decision to deliver Steve to Tania and E.M., people for whom she had no contact information and who became elusive once Steve was in their custody.  Grandmother was admittedly uncomfortable with the idea that Steve would be staying overnight with Tania and E.M., but still allowed it.  When the worst happened, grandmother compounded the problem by lying to law enforcement authorities and social workers when they tried to determine how Steve came to be in the custody of his abuser.

However, the record shows that grandmother soon realized her mistake.  She admitted to social workers she had lied out of fear, and provided an account of what actually occurred.  Moreover, grandmother attested to her agony over Steve's death, her commitment to Eric, and her intention to comply with all court orders going forward, even if that meant cutting off all contact with mother.  Prior to Steve's death, DCFS gave grandmother full marks for her care of the boys, and noted they were safe and thriving in her home.  Based on the evidence at the hearing, the juvenile court could conclude that grandmother "learned her lesson" from Steve's death, and would return to a high level of caretaking with Eric.

Furthermore, all parties agreed Eric was strongly bonded to grandmother.  He viewed her as a mother.  His parents had failed him, he had just lost his brother, and grandmother was the one close connection he had left.  The juvenile court correctly considered that aspect of Eric's best interest in deciding whether he should be removed from grandmother's care.

DCFS is understandably alarmed by grandmother's behavior. However, it overreaches when it argues the situation here is like that in *T.W.*, *supra*, 203 Cal.App.4th at page 47. In that case, a social services agency planned to remove a minor from his prospective adoptive parent because it determined the parent's older child was returning home from juvenile hall. The returning child had been adjudged a ward of the court under section 602, with a history of violence, substance abuse, and sexually reactive behavior. He was also considered by law enforcement authorities to be active in gangs. (*T.W.*, *supra*, at pp. 33, 35-36.) But the juvenile court found the evidence advanced to support the removal was exaggerated or untrue, and social worker testimony "'contrived, unsupported, and not credible.'" Meanwhile, T.W. was thriving in the placement and had been told he would be adopted. Thus, the juvenile court determined it was in T.W.'s best interest to remain in the placement. (*Id*. at pp. 39-40.)

The *T.W.* court reversed. Significantly, it agreed with the proposition that the best interest inquiry controlled, and deferred to the juvenile court's factual findings and credibility determinations. (*T.W.*, *supra*, 203 Cal.App.4th at pp. 42, 46, 47.) However, the court did not believe the juvenile court gave adequate weight to the policy behind the statute prohibiting placement of dependent minors with section 602 wards. (*Id.* at pp. 34, 47.) The court noted that T.W. was only eight, and the older child was violent, had a substance abuse problem, and was considered to be an active gang member. It was not in T.W.'s best interest to be adopted into such a home. (*Id.* at p. 47.)

The facts of this case do not suggest the juvenile court's decision should be similarly overruled. The juvenile court did not ignore or misread any statutory preferences that might affect its best interest determination. There is no suggestion grandmother's home would subject Eric to criminal activity or unsavory influences that are against public policy. Aside from her poor judgment in permitting mother to transport Steve alone, and leaving him overnight with Tania and E.M., grandmother had a steady record of properly caring for the children. The juvenile court made a credibility determination that grandmother was aware of her mistake and had corrected her behavior.

This case is more akin to the situation in *State Dept. of Social Services*, *supra*, 162 Cal.App.4th at pages 282-283, 287. In that case, children who were thriving were removed from a prospective adoptive parent who was found to be using corporal punishment as a disciplinary tool. He was educated on why the practice was improper, and promised to stop employing it. (*Id*. at pp. 280-283.) The *State Dept. of Social Services* court concluded it was not just proper but necessary to consider actions taken to alleviate the conditions that led to the emergency removal in making a best interest determination. (*Id*. at pp. 286-287.) It therefore affirmed the juvenile court's order returning the children to the prospective adoptive parent in light of the corrected circumstances. (*Id*. at pp. 276, 287.) Just so, the juvenile court's determination here that Eric's best interest was to remain with his grandmother in light of her renewed commitment to protect him, in compliance with court orders, was not an abuse of discretion.

## DISPOSITION

The petition for extraordinary relief is denied. This opinion shall become final immediately upon filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P. J.
BOREN

We concur:


_____, J.                    _____, J.
ASHMANN-GERST                                CHAVEZ


9