Filed 5/2/25  M.R. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| M.R. et al., | E085517 |
| Petitioners, | (Super.Ct.No. RIJ2100231) |
| v. | OPINION |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Dorothy McLaughlin, Judge. Petition denied.

David Goldstein for Petitioners.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Larisa R-McKenna, Deputy County Counsel, for Real Party in Interest

Petitioners are prospective adoptive parents of two dependent children. They seek an extraordinary writ challenging the juvenile court's order removing those children, arguing the juvenile court abused its discretion by ordering the removal. We deny the petition.

BACKGROUND

This case concerns two dependent children of the court—E.P. (born 2019) and D.E. (born 2021). As of October 2024, the children were placed with two prospective adoptive parents (PAPs)—M.L. and B.H.

On October 4, 2024 the department received a referral alleging the PAPs physically abused the children. The department spoke to E.P., who said M.L. hit him on the arm with a blue plastic bat because he broke a gate. He also said the PAPs spanked him for misbehavior, that M.L. hit him in the head with the same blue plastic bat on a different occasion, and that M.L. had pulled his hair before. D.E. denied ever seeing E.P. get hit but said he saw at least one of the PAPs pull E.P.'s hair because E.P. was not listening. However, he otherwise denied any form of corporal punishment, saying the PAPs only put the children on timeout.

M.L. initially denied ever using physical discipline, saying he used timeouts or stern verbal redirection. He said at most he sometimes mimed hitting the children without ever actually hitting them. However, when asked directly whether the PAPs

2

spanked, pulled hair, or smacked the children's hands, M.L. said they had smacked D.E.'s hand and had used spankings in the past but no longer do. He denied hitting E.P. with the bat but admitted to being frustrated with E.P. He said it was dark at the time of the alleged incident and he was using the bat to move things around in the yard. He said he might have accidentally touched E.P. with the bat while doing this but was not sure. Nevertheless, during the interview, he called E.P. over, apologized to him, and gave him a hug.

B.H. confirmed they spanked the children in the past, but that was rare. He denied any other physical discipline.

The department conducted forensic interviews of both children on October 15, 2024. E.P. said M.L. spanks him "all over his body" with a black shoe and identified multiple body parts including his head, buttocks, back and belly. He also said B.H. hit him in the back with a shoe. E.P. said B.H. also spanks D.E., but only with his hand. When asked about the incident with the bat, E.P. denied anything happened. After the department moved on, E.P. stated, unprompted, " 'Nobody hit me. And nobody makes me cry. Don't get me in trouble because they love me. And I want to stay in their house forever.' " He denied that anyone had told him what to say. D.E. was rambunctious during questioning, had difficulty paying attention, and answered every question with "I don't know."

For a few reasons, the department was concerned the children had been coached. First, E.P. was initially open to sharing information, but once the incident with the bat

3

was brought up, he "became closed off."  Second, both children's answers were different from the first time they were questioned.  And third, E.P.'s unprompted denial was suspicious.  The department provided the PAPs with a Notice of Intent to Remove the children the next day.

Sometime before December 24, 2024, E.P. was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD).  The PAPs did not express any concerns.

In its December 2024 report following the notice of intent to remove, the department stated it no longer recommended the PAPs adopt the children.  The department believed the current placement was not appropriate because the PAPs "admitted to using spankings in the past," and did so "when the children are asked [a] repetitive amount of times to stop doing something or when they get physical with one another."  This was against department policy, which banned all forms of physical discipline for foster children.  The department also noted that despite E.P.'s diagnosis of ADHD and ODD, M.L. "appeared to minimize the children's behaviors that include biting."  Because of this the department believed the PAPs "have failed to demonstrate an understanding of the children's needs, which could increase the risk of harm to the children due to their challenging behaviors."  Thus, although the PAPs "complied with all that the [d]epartment has requested of them," the department recommended removing the children and placing them in another home "that is better equipped to address the children's ongoing special needs without resorting to physical discipline."

4

The department met with the PAPs on December 12, 2024. The PAPs told the department they were compliant with all services and were able to summarize what they learned. These services included Trust-Based Relational Intervention, which the PAPs told the department was "an attachment-based, trauma-informed intervention that is designed to meet the complex needs of vulnerable children." Though the PAPs felt a lot of it was "common sense," they were glad to participate, as it was a group setting and they felt they could learn from the others there.

There remained some areas of concern, though. For instance, during the interview the department saw D.E. hit M.L., but M.L. did not react. When questioned, the PAPs said they normally redirect the children when the children hit someone, but the department saw no attempts to do so during the interview. The department also noticed concerning behavior when speaking to the children alone. The children were rambunctious during their private interview, taking out toys and jumping on their beds such that the department had to redirect them to avoid injury. E.P. told the department they "don't get in trouble" and that there are "no spankings, they talk to us and put us in time out with no TV." The social worker who questioned the children later testified E.P.'s responses seemed coached and robotic.

Because of this, the department continued to recommend removal. They noted that E.P.'s answers had changed dramatically, from telling them M.L. hit him with a bat, to denying the bat incident but saying both parents pulled his hair and spanked him all over with a shoe, to now saying that there was no physical discipline at all. The

department continued to be concerned the PAPs had used physical discipline for any reason at any time, despite receiving training not to do so before becoming certified to be adoptive parents. The department was also concerned that the parents did not demonstrate any of the techniques they were learning in their training while the department was observing them, instead ignoring D.E.'s aggressive behavior. The department believed that such negative behaviors would increase with age and that therefore the children would be at risk of physical harm or neglect if left in the PAPs' home.

The court held an evidentiary hearing on January 7, 2025. The department testified through two different social workers about its numerous concerns, including: the children's ongoing aggressive behavior, the PAPs admitted use of corporal punishment despite receiving training to use other forms of discipline, and that the children were coached to provide certain answers to the department's questions. The department said they were worried the children's aggressive behavior and the PAP's use of corporal punishment would continue after adoption was finalized when the department was no longer supervising them, because "past behaviors predict future behaviors."

Both of the PAPs testified. B.H. testified that he swatted each of the children on the behind once, but otherwise denied physical discipline. He also denied that M.L. ever used inappropriate physical discipline, including denying that he used a shoe or a bat to hit the children. However, B.H. admitted he was not present for the alleged incident with

6

the bat. B.H. also admitted that once M.L. grabbed E.P.'s hair with two fingers to pull him away from a flaming stove.

M.L. denied hitting either child with the bat during the alleged incident, saying instead that he banged it on a tree to get E.P.'s attention and compel him to pick up his toys. M.L. never saw any marks on E.P. but did see E.P. cradling his wrist after roughhousing with and breaking a gate. M.L. confirmed B.H.'s testimony that he had tapped E.P. on the bottom once and pulled E.P.'s hair to get him away from a flaming stove.

After hearing and reviewing all the evidence, the court concluded removal was appropriate. Specifically, the court considered it "inescapable," that both the children and the PAPs admitted to physical abuse of some kind. It also found the PAPs less credible than the children, saying that in order to get the full story it took "repeated questioning and thinking about things, and different answers were provided at different times." Accordingly, the court found by preponderance of the evidence that removal was in the children's best interest and ordered them removed.

## DISCUSSION

"The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. ([Welf. & Inst. Code,] § 366.26, subd. (n)(3)(B).) If a prospective adoptive parent objects to the child's removal from the home, the [a]gency must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the

7

child's best interests." (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.) We

" review the juvenile court's finding that the change is in the minor's best interests to

determine whether there is substantial evidence in the record to support it." (*In re M.M.*

(2015) 235 Cal.App.4th 54, 64.) " 'Under the substantial evidence standard of review, an

appellate court reviews the record in the light most favorable to the [juvenile] court's

findings. [Citation.] " ' " ' If the circumstances reasonably justify the trier of fact's

findings, the opinion of the reviewing court that the circumstances might also be

reasonably reconciled with a contrary finding does not warrant a reversal of the

judgment. ' " ' " [Citation.] We may not reweigh or express an independent judgment

on the evidence.' " (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 496.) This

prohibition on reweighing the evidence also means "[w]e do not evaluate the credibility

of witnesses." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) If substantial evidence

supports the finding that removal would be in the children's best interest, " ' "a reviewing

court will not disturb [a juvenile court's custody] decision unless the [juvenile] court has

exceeded the limits of legal discretion by making an arbitrary, capricious, or patently

absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)[1]

---

[1] The parties argue that we should review the court's placement decision for abuse of discretion. However, the court does not appear to have made a placement decision, only ordered the children removed from the PAPs. While we would review a placement decision for abuse of discretion, we review removal decisions only to determine whether substantial evidence supports that removal is in the children's best interests. (See, e.g., *In re M.M., supra,* 235 Cal.App.4th at p. 64 [noting that though the court's order in that case was "couched as a placement order, it was necessarily a removal order," and therefore the suitability of placement was not at issue.])

Here there was substantial evidence that removal would be in the children's best interests. The juvenile court's primary justification for that finding was that all parties agreed the PAPs sometimes used corporal punishment, despite being trained and told not to do so. The court did not credit the PAPs explanation about M.L. hitting E.P. with a bat, instead crediting the children's statements. Thus, there was sufficient evidence the PAPs used inappropriate physical discipline, which was sufficient evidence to conclude removal was in the children's best interests, even if it did not compel that determination.

The PAPs argue the court erred by crediting the children's statements. For instance, they note the children changed their stories, often more dramatically and over a shorter time period than the PAPs did. E.P. initially claimed M.L. hit him with a bat, then recanted that statement. He then claimed he was spanked all over his body with a shoe, a statement which was not corroborated by D.E. or by any physical evidence. He also recanted this statement later in the same interview, insisting instead that nobody hit him. D.E., on the other hand, consistently stated that he did not see E.P. ever get hit, but did see E.P. get his hair pulled. As the PAPs observe, then, the children's statements was inconsistent.

Nevertheless, the juvenile court has the exclusive power to judge credibility. Here the court expressly stated that it believed the children when they reported they were physically disciplined, in part because the PAPs admitted to physically disciplining them. The court observed both PAPs testify and nevertheless did not find them fully credible. Whether we would have made the same credibility determination is irrelevant—the

9

juvenile court made its determination, and we are not permitted to question it, nor did we observe their testimony.

In this case, there was particular reason for the Department to conclude that the PAPs' use of corporal discipline meant removal was in the children's best interests. E.P.'s diagnoses of ADHD and ODD make him likely to remain inattentive and/or defiant, and the PAPs admitted to using physical discipline when the children were particularly inattentive or defiant. Their doing so was in violation of department policy and the PAPs' training and instruction, both of which forbade using corporal punishment for any reason. Though the PAPs claimed they had stopped the practice, they likely will continue to be tested by E.P.'s diagnosed behaviors, creating a particular risk that they will return to corporal punishment, especially once the department stops supervising them. Because substantial evidence supported the juvenile court's order removing the children from the PAPs, we deny their writ petition.

### DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

10