Filed 12/16/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

AMBER G. et al.,

    Petitioners,

        v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

    Respondent;

ORANGE COUNTY SOCIAL
SERVICES AGENCY,

    Real Party in Interest.

G061684

(Super. Ct. No. 21DP0578)

O P I N I O N

Petitions for extraordinary writ from a postjudgment order of the Superior
Court of Orange County, Isabel Apkarian, Judge. Writ petitions granted.

Family Building and Ted R. Youmans; Leslie A. Barry for Petitioner
Amber G.

Law Offices of Harold LaFlamme and Carolina P. Trucios for Petitioner
W.M.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B.
Morse, Deputy County Counsel, for Real Party in Interest.

In these writ petitions, petitioners W.M., the minor, and Amber G., her prospective adoptive parent/de facto parent, seek an extraordinary writ from the juvenile court's order removing W.M. from Amber's care and placing her with out-of-state relatives she has never met. This is a heartbreaking case made worse by the unexplained and unfathomable time delay in completing an out-of-state ICPC.[1] Further complicating the case was the Orange County Social Services Agency's (SSA) apparent misunderstanding it had the burden of proving by a preponderance of the evidence that its proposed *removal* was in W.M.'s best interest. Our Legislature has enacted a complex scheme of placement preferences, and SSA conflated the considerations involved in the *placement* of a child with those involved in *removing* a child posttermination from a prospective adoptive parent's home. The terms placement and removal are not synonymous and should not be used interchangeably. While *placement* with relatives is generally favored when the need arises, *removal* from any stable, permanent, loving home (with non-relatives or relatives), particularly after a child has been freed for adoption, is not. By failing to recognize its burden in recommending W.M.'s *removal,* SSA obscured the critical decision the juvenile court needed to make: Was removing W.M. from her current placement in her best interest?

After carefully reviewing the entire record, we appreciate the juvenile court's frustration with the ICPC delay, and well-grounded instinct that children should be *placed* with relatives. (Welf. & Inst. Code, § 361.3 [relative placement preference].)[2]

---

[1] ICPC is the acronym for the Interstate Compact on the Placement of Children. It is a statutory agreement between states that governs the placement of children from one state to another state. (*In re C.B.* (2010) 188 Cal.App.4th 1024, 1031-1032.) "'"The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children. [Citation.]"' [Citation.]" (*Id.* at p. 1032; Fam. Code, § 7901.)

[2] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

We understand SSA's evidence supported a pre-termination relative placement. But in this case, SSA was obligated to do much more pursuant to the prospective adoptive parent (PAP) preference (§ 362.6, subd. (n)). The statute also required the court to hold a hearing and review all material evidence relating to SSA's removal decision before approving or rejecting it. In this case, it appears the court focused on the reasons for the delay in placing W.M. with her relatives, and neglected to sufficiently consider section 366.26, subdivision (n)'s directive.

Petitioners seek extraordinary writ relief, arguing there was insufficient evidence that it would be in 14-month-old W.M.'s best interest to remove her from the only family she has ever known, and eliminate any chance she has of connecting with her siblings, for the opportunity to live with out-of-state blood relatives who are strangers to her. (§ 366.28, subd. (n) [order not appealable]; Cal. Rules of Court, rules 8.450-8.452.)[3] We grant the petitions and vacate the juvenile court's removal order. The matter is remanded to the juvenile court. Unless W.M.'s circumstances have changed dramatically while this matter was pending, we invite the parties to stipulate to an immediate remittitur to expedite W.M.'s adoption proceedings with Amber.

FACTS

W.M. was born on May 25, 2021, with a positive toxicology screen for amphetamines and marijuana and weighing only 5.9 pounds. The juvenile court terminated W.M.'s biological parents' rights nearly one year later, on May 12, 2022. For purposes of this writ petition, we need not recount the facts underlying the dependency proceedings because they are not relevant to the narrow issue before us. The following is a summary of facts relevant to the issue raised in this appeal, i.e., W.M.'s best interests posttermination.

---

[3]      All further rule references are to the California Rules of Court

3

I. *Detention Report June 1, 2021*

Three days after her birth, W.M. was released from the hospital and placed with Amber (a "resource family" as defined by § 16519.5, subd. (d)).[4] SSA's detention report, dated June 1, 2021, stated W.M. had three siblings. W.M.'s biological mother (Mother) failed to reunify with a son (Brother), born in 2017, and two daughters, P.F. and N.F., born in 2018 and 2020, respectively. W.M.'s biological father (Father) retained legal custody of Brother, but the court terminated his parental rights to P.F. and N.F. in 2019 and 2020.[5] P.F. and N.F. were adopted by different families living in Southern California.

The social worker reported W.M.'s biological parents did not provide information regarding relatives for placement. Mother wanted W.M. released to Father. The social worker contacted the families who adopted W.M.'s siblings, but they were not interested in placement. However, they were willing to support W.M.'s caregiver by providing babysitting and arranging for sibling visits.

SSA's petition alleged W.M. was subject to the juvenile court's jurisdiction pursuant to section 300, subdivisions (b) and (j). A few days later, the court formally detained W.M. and scheduled the jurisdiction hearing for July 15, 2021.

---

[4]    Effective January 1, 2017, California changed the approval process for resource families under section 16519.5, subdivision (d). Amber successfully met the home environment assessment standards and the permanency assessment criteria necessary for providing care to a child in dependency proceedings.

[5]    Father stated he was the biological father of P.F. and N.F., but he did not participate in their dependency cases because he was "tired of having to go through Social Services and doing everything they asked of him, after having to do so for" Brother.

II. *Jurisdiction/Disposition Report July 15, 2021 and Addendum August 28, 2021*

The social worker's July 15, 2021, report noted W.M. adjusted well to living with her caregiver. Amber took W.M. to several pediatrician appointments. She reported the minor was healthy, sleeping well, eating well, and gaining weight.

In her report, the social worker recounted her *first* conversation with W.M.'s maternal aunt, Brytnee R. (Brytnee), took place on June 16, 2021. Brytnee indicated she had limited communication with Mother, who most often contacted her family through social media. Brytnee stated she found out about W.M. from N.F.'s social worker in Los Angeles County. Brytnee provided some insight into Mother's past and said she was aware that Brother lived with his paternal grandmother in Southern California.

Brytnee said Mother was spoiled and her three older siblings took turns mothering her when she was growing up. The family had offered to help Mother stop using drugs, but she refused. Brytnee stated she was interested in adopting W.M. and her siblings. Brytnee requested an ICPC. Two weeks later, on June 29, Brytnee called the social worker, who returned the call the following day to report there was no update on the ICPC.

On June 30, 2021, the social worker also spoke with W.M.'s maternal grandmother (Grandmother) on the telephone. Grandmother "expressed how she ha[d] previously made efforts to have [Mother's] children in her care, through an ICPC." She "shared how she was in an ongoing struggle with [Mother]." The social worker noted Grandmother "kept reiterating" she was unaware of Mother's pregnancies until after the children were born. Grandmother knew Brother was living with his paternal grandmother, who Grandmother believed was his legal guardian. With respect to Mother's other children, Grandmother admitted she had been unable to meet them, but she kept in contact with the two girls' respective caregivers. She opined the children were in good care, but she wished they could be with her.

Grandmother believed Mother began abusing drugs after her first child's birth. When Mother gave birth to her second child, Grandmother said she traveled to California to "'check on things'" and to make sure Mother went to court. Grandmother stayed for several months and saw Mother was cleaning herself up and participating in her court-ordered services. Grandmother believed Mother could remain clean and encouraged her to move back to Virginia. Grandmother told the social worker that Mother "could turn it around, if she wanted to."

The social worker interviewed Mother, who explained she had siblings who lived in North Carolina, Alabama, and Virginia. Mother claimed she consistently communicated with her siblings, who had raised her when Grandmother was working. Mother claimed she gave up on her court case plans to reunite with W.M.'s three older siblings because the children were "removed from . . . [G]randmother's care."

Mother refused to voluntarily relinquish W.M. for adoption and indicated if she could not reunify with the child, she would choose Grandmother to be the caretaker. Father also refused to voluntarily relinquish W.M. for adoption and agreed that if he could not care for her, the child should be placed with Grandmother or paternal grandmother. Neither parent identified Brytnee as a potential caregiver. Rather, Father reported there were no other placement options.

In an addendum report filed August 24, 2021, the social worker described her visit with Amber and W.M. During the meeting, Amber reported W.M. was sleeping well and waking up during the night to eat and for diaper changes. The social worker noted W.M. was not suffering from withdrawal symptoms, she was reaching all her developmental milestones, and she was starting to coo and smile. She now weighed a little over 10 pounds, and she had received her vaccinations. Amber wanted to adopt the then three-month-old W.M.

The social worker also described how Amber helped Father during his visits with W.M. She saw Amber prepare a bottle for him and assist him with feeding

6

and holding W.M.  During another visit, Father handed W.M. to Amber to change her diaper.  When Father stated he wanted to cut his visitation time because he was not sure what he would do for eight hours with a baby, Amber offered to help him for the entire time, but Father declined.

The social worker also updated the juvenile court on the status of Brytnee's ICPC.  The social worker stated that on August 10, 2021, she signed the ICPC paperwork and informed Brytnee "she can expect for things to move forward."  On August 16 and 18, the social worker asked a different social worker about the ICPC.  The social worker learned on August 19, 2021, that she needed to sign additional documents, which she signed and submitted that same day.  The social worker informed the court that both Amber and Brytnee wanted to adopt W.M.

After several continuances, the juvenile court held the jurisdiction/disposition hearing on August 26, 2021.  It sustained an amended petition, removed W.M. from parental custody, and declared W.M. a dependent of the court.

III.  *Review Hearing Reports November 2021 to January 2022*

The social worker filed an interim report at the end of November 2021.  Amber was trying to accommodate Father's requests to reduce the length of visitation times by agreeing to meet with him four times per week for two hours.  Amber reported W.M. was a "'happy baby'" who typically would only wake up one time at night for a feeding and then would sleep until 7:00 a.m.  Amber reported W.M. was eating every three hours and took short naps throughout the day.  Amber stated the minor loved attention and standing up while being held.  She had learned how to roll over, she was laughing, and would follow the movement of her caretaker's face.

The social worker confirmed W.M. moved her head to look at Amber, smiled, cooed, and reached out for things.  By all medical accounts, W.M. was healthy, developmentally on track, eating well, and thriving in Amber's care.  In November, W.M. started eating solid foods and had started trying to crawl.

Amber reported she was able to financially care for W.M. and was "willing to reach out to the child's siblings who live nearby so the child has contact with them." Amber had spoken to Brytnee in Virginia and given Brytnee her phone number. Amber reported Brytnee had reached out twice, the last time being in early September 2021.

The social worker included a section in her report called "Concurrent planning/Permanency." Therein the social worker noted, "The caretaker shared that her teen daughter and the caretaker's mother 'are in love' with the child and desire that the child become part of their family permanently." Amber stated she intended to "keep the child in contact with her other siblings who have been adopted, [and she had] the contact information of the adoptive parents who reside in Southern California."

During a different visit, the social worker observed W.M. (then five months old) reaching for and putting a pacifier in her mouth while being held by Amber. She heard W.M. cooing and saw her smiling when spoken too. She saw that when Amber put W.M. on her belly, the child held up her head and smiled.

Regarding the pending ICPC, the social worker noted Brytnee called her on September 16, 2021, to request placement.[6] She e-mailed the information to Brytnee on September 23 and completed the final paperwork for the ICPC on October 28, 2021. The social worker noted she spoke to Brytnee on November 15, 2021. "[She] was updated on the ICPC referral. The new paperwork had been submitted and still pending approval." She noted both the resource family and Brytnee wished to adopt.

At the interim/status review hearing, on November 29, 2021, SSA filed a section 388 motion seeking early termination of Father's reunification services. The juvenile court scheduled a hearing for January 12, 2022. Before this hearing, the social worker filed an interim report stating she visited W.M. in early December 2021 and the

---

[6] This report conflicts with earlier reports regarding when Brytnee requested placement. At the hearing, the social worker and Brytnee confirmed she first requested placement in June 2021, not September 2021.

child was still thriving in Amber's care. W.M. was enjoying solid foods and had developed a routine sleeping and eating schedule. The social worker noted W.M. frequently smiled and cooed. She played with her toys while Amber held her. Amber told the social worker that neither Father, nor Mother's family in Virginia, had contacted her recently to ask about W.M.

During a visit in January 2022, the social worker said W.M. continued to be healthy and happy. She had developed her first tooth and was sleeping in a new crib because she had outgrown her basinet. Amber stated Brytnee contacted her the last week of December to say she had coronavirus disease 2019 (COVID-19) and to wish her a Happy New Year. Amber had not heard from any other family members.

In the section of the report titled "Concurrent planning/Permanency" the social worker discussed how Amber was taking the necessary steps to adopt W.M. and she had filed for de facto parent standing.[7] When the social worker saw W.M. in January 2022, the then seven-month-old was smiling, cooing, and laughing while being held by Amber. "The child played with the caretaker's sweatshirt lace and hair." At the hearing in January 2022, the court terminated services and scheduled a section 366.26 permanency hearing for May 12, 2022.

IV. *De Facto Parent Request April 21, 2021*

On April 21, 2021, Amber filed a de facto parent request. She discussed her close relationship with W.M., developed after spending every day with her for the previous 10 months. Amber opined her work-from-home schedule "allowed [her] to create an unbelievable bond" with W.M. They had a daily routine in place that included

---

[7]    "A de facto parent is 'a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period.' [Citation.] De facto parents have certain procedural rights in dependency proceedings. [Citations.]" (*In re L.M.* (2019) 39 Cal.App.5th 898, 902, fn. 5.)

singing, reading books, sensory play, and learning new things. She was teaching W.M. sign language so she could better communicate her needs, such as when she was hungry. Amber planned to start W.M. with swim lessons in the summer. W.M. was part of all family activities. In response to the question on the pre-printed form asking about what information Amber possessed that others may not have, she responded as follows: "Since I have had her since birth[,] I know exactly what she wants when she displays certain behaviors. I am able to console her when she cries. I have all . . . her medical history."

V. *Permanency Hearing Report May 12, 2022*

In the permanency hearing report (for the May 12, 2022, hearing), the social worker provided her evaluation of W.M. She stated there were no medical concerns and W.M. exhibited "age-appropriate social skills" and was on track developmentally. She was described as joyful, active, and happy. She made cooing sounds, was crawling, and was able to pull herself to a standing position. She liked playing with her toys. Amber told the social worker that W.M. was eating solid foods and her current favorites were strawberries and rice. The social worker noted W.M. was "happy and comfortable" in Amber's home as evidenced by her smiles, her crawling towards toys and Amber, and her hugs for and kisses to Amber. W.M. was feeding and sleeping well. Amber wanted to provide the minor permanency through adoption and was "willing to have ongoing visits" with the siblings who had already been adopted.

The social worker provided the court with an update about the status of Brytnee's "Possible ICPC" in her "History of Contact" section of the report. The social worker repeated that Brytnee requested placement in September 2021 and the final paperwork was completed by the end of October 2021. She stated that in November 2021, she advised Brytnee that *new* paperwork was submitted and pending approval. The social worker noted that on January 5, 2022, she received an update from the ICPC worker. She learned the application was stalled because the application did not include W.M.'s social security card or birth certificate. The social worker requested a copy of

10

these documents from "the child's eligibility technician." In summary, as of January 2022, Brytnee's July 2021 ICPC request was incomplete.

The social worker next provided an analysis of W.M.'s adoptability. She repeated what was said in W.M.'s evaluation and added the following information: "The child appears to have a close relationship with the caregiver as she smiles and coos each time the caregiver picks her up and seems to feel extremely comfortable with her. . . . The child possesses many positive qualities, including her young age, good health and development, and happy disposition. Further, the current caregiver wishes to adopt the child, should parental rights be terminated, which greatly increases the likelihood of adoption."

The social worker "identified" Amber as W.M.'s prospective adoptive parent. This conclusion was based on a lengthy assessment (five pages) of Amber's background, social history, motivation in seeking adoption, duration and character of her relationship with the child, and capability of meeting the child's needs. Amber was in her 30s and raised in California. Amber recalled having a happy, healthy, fun, and memorable childhood. She enjoyed school and was involved in extracurricular activities such as running track and being involved in her school's Associated Student Body (ASB). She attended two years of college and then focused her attention on raising her daughter.

Amber's 14-year-old daughter participated in track and field, competitive cheerleading, and gymnastics. She was involved in student government and with her church. Amber and her daughter had a close relationship, and they enjoyed many family activities such as vacations, game nights, and birthday parties.

Amber had been employed for the past four years as a regional sales support manager in the financial industry and was working from home. She could continue to stay at home and care for W.M. Amber relied on her mother, who also lived

11

in the same household, to assist with W.M. whenever she needed to work.  Amber stated she had a very close relationship with her mother.

When asked about her motivation for seeking adoption, Amber stated the following:  "Adoption is both life changing for the child as well as the adoptive families.  It was put on my heart to foster and ultimately adopt.  I think there are so many children out there that need love and homes and since I have established my life already and have the means, amenities, and desire to provide a loving home for a child who could not reunify with their birth families it's simply a no brainer for me."  She added:  "[W.M.] has been with my family . . . since she was [three] days old[,] and today, she is a vibrant, loving, charismatic 10-month-old.  Myself, my mother and my 14-year-old daughter instantly fell in love with [W.M.] and the desire to provide her with a tremendous amount of love and care.  She lights up any room she's in.  She laughs, smiles[,] and cries for the immediate household members and lets us know that she has a connection with us and looks to me for comfort.  She has attended family vacations with us[,] and we treat her as one of the family already.  She is truly so loved[,] and I look forward to continuing to provide a loving, nurturing home for many years to come.  We love [W.M.] and I know she loves us too!"  The social worker confirmed W.M. looked to Amber for care, comfort, and to have her needs met.  She stated W.M. was bonded to Amber.

The social worker stated Amber had demonstrated her ability to meet W.M.'s needs "by providing a safe and secure home, exercising proper care of the child to the best of her ability, and providing her with appropriate supervision.  She is an experienced parent who has demonstrated her ability to parent and protect the child appropriately . . . .  She has stability with respect to her finances and housing situation, as well as has no health conditions that would negatively impact her ability to care for the child."

When asked if she was open to a post-adoption contract, Amber replied she was and she had given Brytnee her phone number.  She stated Brytnee contacted her a

few times to see how W.M. was doing.  The last time they exchanged text messages was five months ago at the end of December 2021.  Amber added, "I am also open to any other family members who share an interest in [W.M.]  I have also asked the current social worker Mariana if she would ask the adoptive parents of the other two sister siblings if the girls can connect.  I feel it's important to be able to have those birth family ties.  I believe having those connections may help with any thoughts of feeling unwanted or those ideas of wondering what their birth families were like.  I truly think keeping an open line is a true benefit to [W.M.] and her birth family."  And finally, the social worker opined Amber was committed to adopting W.M.  She completed all the requirements to become an approved resource family in April 2021.  The social worker recommended the juvenile court terminate parental rights and refer the child to the county adoption agency for adoptive placement.

On May 12, 2022, the court considered the social worker's section 366.26 report, terminated parental rights, and freed W.M. for adoption.  The court stated adoption was the permanent plan and adopted SSA's recommendation.  It set a periodic review hearing for the end of October 2022.

VI.  *SSA's Removal Plans and Opposition*

Approximately two weeks after the permanency hearing (on May 23, 2022), SSA received Brytnee's approved ICPC.  On June 2, 2022, by stipulation of the parties, the court granted Amber de facto parent status.  That same day, the social worker telephoned Amber and told her about SSA's plans to remove W.M. from her care and place the child with Brytnee.

Amber hired an attorney and on June 28, 2022, she filed a request for a PAP designation and objected to W.M.'s removal.  (§ 366.26, subd. (n)(3)(A).)  Amber maintained W.M. was strongly bonded to her and her family, and vice versa.  Amber stated that currently Brytnee had no relationship with the child and had no contact in the

13

last six months.  Amber added that she was open to facilitating a connection between W.M. and her relatives in Virginia.

As part of her request for a PAP designation, Amber indicated what steps she had taken toward adopting W.M.  She had applied for and cooperated with an adoptive home study, requested and was granted de facto parent status, worked to overcome any issues identified by SSA or the adoption agency, and attended classes required of a PAP.

The following month, SSA filed an ex parte "Information-Only" report.  It did not file a notice of intent to seek W.M.'s removal as required by section 366.26, subdivision (n)(3).  In the report, the social worker informed the juvenile court that Brytnee's ICPC was approved "and the child will be placed in" her care.  The social worker noted that when she informed Amber about SSA's removal plans, Amber expressed her belief the move was not in W.M.'s best interest.  Amber stated it was in the minor's best interest to remain in her care and have an opportunity to form connections with her three siblings living in Southern California.  Amber asked the social worker to tell the court she and her family loved W.M., and they wanted to adopt her.  The social worker offered no opinion about whether removal would be in W.M.'s best interest.

The social worker attached as an exhibit a copy of the ICPC report findings, prepared by the Hampton Department of Social Services (HDSS), located in Virginia.  The first page of the exhibit noted the "100A" was completed on February 23, 2022, and the home study was finished on May 17, 2022.  HDSS's social worker reported the agency received ICPC documents on February 23, 2022, requesting a child specific foster home study due to Brytnee's "desire to receive custody of her maternal niece."  The HDSS social worker noted the agency received Brytnee's "initial application" on March 23, 2022, and she had participated in all the required meetings and home assessment visits (transpiring in April and May 2022).

14

The report noted the following information about Brytnee's plans: "[Brytnee] stated that she only has an interest in becoming a foster care placement for her niece . . . at this time. However, [Brytnee] has expressed an interest in providing permanency or respite care for children in the foster care system later on in the distant future. She has stated that her main focus is getting custody of her niece and providing care for her until the child's biological mother can resume responsibilities of taking care of the child. She stated that she would be very open to providing permanency for her relative if the situation requires in the future."

The HDSS social worker positively described Brytnee's personality, interests, values, education, and close support network of friends and family. Brytnee works 40 hours a week as a flight attendant for Mesa Airlines. She was in her early 30s and lived with Grandmother (48 years old) in a child-approved home with adequate space for W.M. She and Grandmother had a very close relationship, and Brytnee reported having a normal and happy childhood. Brytnee had seven siblings and half-siblings (ranging in age from 33 to 14 years), and she spoke to the three eldest on a weekly basis.

Although Brytnee did not have her own children, she felt her life experiences had taught her what was required to be a caretaker. In addition to pre-service training with HDSS, Brytnee played a key role in the lives of her nieces and nephews. Brytnee believed she could meet W.M.'s social and emotional needs and ensure she was provided with love, safety, consistent care, and support. She opined her greatest strengths as a foster parent will be that she is patient, loving, caring, and understanding person who knows how to care for a child.

The social worker spoke to three individuals who gave Brytnee very positive personal references. Brytnee's friends agreed she was patient, nurturing, and loved children, especially children in her family. They reported Brytnee often cared for her nieces and nephews, who loved her. They agreed she would be an excellent caregiver or foster parent for W.M.

The last section of HDSS's report stated Brytnee's "motivation in this process is to become the relative placement resource home for her niece and to have her eventually removed out of the foster care system." HDSS stated, "Based on the above gathered information, interviews, and observations, [HDSS] recommends [W.M.] be placed in [Brytnee's] home. [HDSS] is willing to provide supervision of placement as required or requested."

The following week, the court set a hearing on Amber's objection to removal. It also granted Amber's motion to be a PAP, approving the parties' stipulation on this issue.

The day before the hearing, Amber's counsel filed a memorandum of points and authorities in support of maintaining W.M.'s placement with her PAP. Counsel noted the relative placement did not apply "at this point in this proceeding as the child is not in need of a new placement." Counsel stated 14-month-old W.M. had lived with Amber her entire life. Brytnee had texted with Amber a total of five times, the last text being sent on December 31, 2021. Brytnee had not "visited, spoken to, or requested a FaceTime or other visit with [W.M.] and, therefore, ha[d] no relationship with her."[8] Counsel maintained that due to substantial emotional ties between W.M. and her caregivers, "it would be detrimental to remove [W.M.] from the only home she has ever known."

That same day, Amber filed a caregiver information form. In addition to providing an update on W.M.'s physical health, Amber discussed the child's new social skills and peer relationships. She stated, "[W.M.] babbles, she points to things she wants or will reach and get what she needs. She understands and takes direction very well. She has a close bond with my daughter and calls her 'duster' which I assume means 'sister' in

_____

[8]     On our own motion, we take judicial notice that FaceTime is a video-conferencing application available on Apple electronic devices. (Evid. Code, § 452, subds. (g), (h).)

16

her language.  She has a close relationship with my mother as well.  She will sometimes pass by me to go to my mother as most children do when their grandparents are around."  In the section of the form requesting the caregiver's recommendation for disposition, Amber stated, "I respectfully request that [W.M.] not be removed from my home as it would not be in her best interest.  [W.M.] is bonded to me, my daughter, and my mother.  She does not know her maternal aunt [Brytnee]."

Amber attached a two-page document providing further support for her removal objection.  Amber stated she received text messages on five occasions in 2021 (August 30, September 7, October 6, November 29, and December 30).  She noted Brytnee asked in the August text message if she could contact Amber weekly for updates.  Amber agreed, but Brytnee did not contact her asking for updates.  Amber stated, "Each time [Brytnee] reached out to me, I promptly responded to her, providing [her] with updates and pictures of [W.M.], whether she requested them or not."  She had not heard from Brytnee since her last text message in December 2021.  Amber stated that on July 12, 2022, she "reached out" to Brytnee "to connect further and talk.  I also asked her some questions.  She did not get back to me."

Amber attached a document demonstrating how W.M. was a part of her family and they had developed a "truly magical" bond.  She stated W.M. was a happy, friendly baby who knew "without a doubt" she is loved.  Amber described how W.M. spent most of the day with her, sitting on her hip or lap.  W.M. would "voice her opinion (by screams or a cry)" if Amber walked away even if it was to the next room.  She said W.M. had a special blanket to sleep with at night.  Amber described in detail her daily routine with W.M., which included learning how to self-feed and taking walks in the neighborhood.  Amber also described the strong bond her daughter shared with W.M. since she arrived:  "The sheer joy that comes across [W.M.'s] face when my daughter arrives home is so heart felt.  The two of them play together . . . .  Everything my

17

daughter does, [W.M.] is right behind her looking up to her." Amber stated her mother and W.M. had developed an "incredible bond."

Amber concluded by stating she would "welcome the idea of an open adoption and relationship with [Brytnee] and extended family." She noted that if W.M. were to move to Virginia, this would "take away the possibility for [W.M.] to have a relationship with her siblings who live in California." She added it would be in W.M.'s best interest to remain in her care because she intended to work on establishing these familial relationships. She stated, "It is my desire to adopt [W.M.] as was the original plan when I picked her up from the hospital. I respectfully ask the court to consider the tremendous amount of time that has passed since [W.M.] has been placed in my care as well as the lack of interaction she has had with [Brytnee] . . . . [W.M.] is so loved by myself and my family and she is well taken care of physically, emotionally, and financially. It would be emotionally devastating to her to be removed from my home this far along in the process."

SSA did not submit any additional evidence beyond the HDSS report. The social worker did not prepare a supplemental report pointing to evidence supporting its decision. SSA provided no explanation for why the evidence regarding W.M.'s current circumstances created any reason to remove W.M. from her home. The decision was based on the belated approval of Brytnee's ICPC.

VII. *The Hearing*

The juvenile court considered the matter on August 12, 2022. Brytnee and Grandmother attended virtually, while Amber, her counsel, minor's counsel, and SSA's counsel attended in person. The court began the hearing by asking the parties to clarify a discrepancy in the record regarding when SSA first became aware Brytnee's desired placement and what day the minor was placed with Amber. Minor's counsel stated there was an error in the social worker's report, and W.M. was placed with Amber on May 28,

18

2021, not in June 2021. The parties agreed Brytnee requested placement in June 2021, before the jurisdictional hearing.

Minor's counsel explained Brytnee came forward "around the jurisdiction date very early on" and the "delay was in the [ICPC] process." Minor's counsel stated everyone was aware Brytnee was asking for placement, but Amber took care of the child for over a year and the section 366.26 report named her the PAP. Minor's counsel was in support of the court granting Amber's motion to be the PAP and objected to SSA's plans to remove W.M. from Amber's care. She added, "What we have here is two good homes and one family that is going to have their heart broken, but I have to see it based off . . . [W.M.]; the fact that she has been her entire life with [Amber], the fact that she has been well taken care of. I know she is going to be taken care of in [Amber's] home. She has a substantial bond, and for all purposes, [Amber] is her mom. [¶] What made this difficult is that the only information is that [Brytnee] only reached out a few times. . . . I haven't been able to see whether they have had any visits or their type of relationship."

Brytnee testified she found out about W.M. during a call to a social worker about W.M.'s sister. Brytnee did not know Mother was pregnant with W.M. and she asked if the child could be placed with her. She recalled the social worker stated W.M. was a newborn and Brytnee had to wait until the first court date to begin the process.

The court replied, "Here is the problem that I have. [W.M.] is with a very loving caregiver since pretty much the day she was born. Relative placement is in the law for a reason, so to argue now that too much time has passed through no fault of [Brytnee] seems like a circular argument. [¶] Why wouldn't the agency or anyone else who doesn't . . . support relative placement delay a matter for 6-, 12-, 18 months and then argue too much time has passed? [¶] This is tragic because someone is leaving this courtroom . . . with utter heartbreak, and I'm, frankly, very angry to be put in this position because it shouldn't take six or eight months when we're dealing with a newborn to have an [ICPC] approved. The system is so deeply flawed."

19

Amber's counsel stated he shared the same concerns as the court. He indicated that in his 34 years of practice, the system had not changed and was unfair to relatives who lived out of state. Counsel wished to make clear he and his client did not feel any ill will towards W.M.'s relatives and everyone wanted what was fair, but really the "real victim here" was W.M. He argued that because Amber and her 14-year-old daughter were strongly bonded to W.M., they were objecting to her removal from their care. Minor's counsel added the focus must be on W.M. and even if the section 366.26 hearing had not happened and relative placement still mattered, it would be difficult to support removing the child from her caregivers.

Brytnee spoke next, and she clarified she wanted the court to know that she never doubted wanting placement and cried with the caseworker about why the process was taking so long. Brytnee admitted some of the delay was because she was sent the wrong paperwork. She said she was grateful Amber stepped in and loved W.M. but she "could do that as well." Brytnee stated she wanted W.M. since day one, and she had family in Virginia that loved the child. She said W.M. had 10 cousins in Virginia, and some were close to her age. Brytnee added she requested photographs of W.M. and sent pictures of herself and Grandmother for Amber to show W.M. She said the kids "at home" had seen W.M.'s photos and they always asked about her. She said it was nice to share the photos and hear her nieces and nephews say W.M. was "'so cute.'"

Grandmother added their family had no doubts about wanting to raise W.M. "She should be with her family that wants her and loves her." Grandmother added she was willing to be a "caregiver as well" because she and Brytnee were "a team, so that is why I'm here today as well because we're a team, and that is my youngest daughter's baby." The court interjected that Mother's wishes were not relevant and the court needed to make sure "this is not an effort to secure the child with the hopes that one day [Mother] will turn her life around." Grandmother replied, "Oh, no, no, ma'am," and added, "that is not the agenda." Brytnee clarified that early on she was asked about placement, and then

20

she was asked about adoption, and she had no hesitation in saying she would adopt W.M. She stated, "I just really want her. Like I said, my position on getting her has not changed since the day I found out that she was born."

When the court asked Brytnee if she would be interested in having Amber adopt W.M. with an open adoption, Brytnee replied she really wanted to be in W.M.'s life and had been trying to bring her home for a long time. She said that it was not her fault that she was not able to take home W.M. sooner and was upset, saying, "It's kind of boiling down to [who spent more time with W.M.] because like I said, I've been trying and trying and trying, and I can only move as fast as the courts."

Amber's counsel advised the court that he had tried to arrange a meeting between the parties before the hearing. They were hoping Brytnee would consider Amber's plans for an open adoption, but also understood they could not force Brytnee to speak to Amber. Counsel asked if he could describe for the court, and Brytnee, what Amber was proposing for an open adoption. The court said it would not require Brytnee to agree but counsel could put the information on the record.

Counsel stated Amber wanted to establish a shared photo album where everyone could upload videos and photographs. Amber would be willing to FaceTime with Brytnee on a weekly basis, and she would be available anytime. Because Amber traveled to New York for her work three or four times a year, she was planning face-to-face visits with cousins and family in Virginia several times each year. Amber wanted Brytnee and Grandmother to be involved with W.M. and bridge the distance between the families. She testified W.M. would "grow up knowing you as her aunt, knowing your mother as her [G]randmother." Amber wanted to develop a "sister relationship" with Brytnee and share W.M. with her. Counsel added the open adoption contract would be binding and enforceable.

The juvenile court asked for SSA's input. County counsel stated, "It's obvious that the court appreciates the impossible situation that, you know, even the

21

agency was in.  This could not have been resolved with a simple risk assessment."
County counsel added the relative placement preference was replaced after the section
366.26 hearing with a PAP preference and due to this conflict, the court must decide
whether it was in W.M.'s best interest to move.  Counsel stated SSA's position was as
follows:  "As far as risk is concerned[,] we have found two appropriate homes.  The
agency does confirm the information as to the historical contact of [Brytnee]; that it was
intermittent at the beginning, that there has been some lapse in the middle, that there was
no FaceTime sought or no in-person visitation.  But I understand the realities of people
living on opposite sides of the country."  County counsel repeated the court would need
to consider if it was in W.M.'s best interest to move.

The juvenile court replied, "Well, the court can find it's in her best interest
to move to have a relationship with her biological family for the rest of her life.  I don't
have to only consider the past 14 months, I have to consider the rest of this child's life.
That, to me, isn't the hard part."

The court asked Brytnee if she had anything to add after hearing from
Amber's counsel.  Brytnee replied she was aware Amber had requested a meeting, but
she was unsure about attending without representation of her own.  She thought it would
be safer to wait until the court hearing.  The court reassured Brytnee that it was not
holding her lack of attendance at the meeting against her.  It asked Brytnee if she would
be willing to speak to Amber and her counsel.

Brytnee responded that if she was awarded placement, she would provide
Amber with all the same things mentioned by her counsel, such as photos and videos.
She acknowledged Amber was a big part of the beginning of W.M.'s life and she should
remain so.  She stated her plans were the following:  "I would say first, I really want her
to get acclimated with me so she realizes that I'm taking care of her now, you know, and
then if [Amber] wants photos and things like that, I have no problem with saying that—
you know, I love taking pictures, so I have no problem sending pictures and videos,

22

things of that [n]ature. [¶] Every single time I talk to [Amber], I ask her 'Do you have any pictures?' 'Do you have any pictures?' 'Do you have any pictures?' [¶] I've only gotten three pictures, but I ask every single time: 'Do you have any pictures?' 'Do you have any pictures?' Because I'm interested. [¶] So I'm saying the same thing [as Amber is saying to me] vice versa."

The court asked if there were any further comments. Amber's counsel stated, "I don't want to get ticky-tacky, but every time that—there has been five contacts via text message and my client has always sent pictures, so, again, I don't want to argue here but [Amber] has always been very receptive and always responded to [Brytnee] with everything that [she's] asked, at least in her opinion. The goal was to always keep [Brytnee] updated."

At the hearing, counsel asked Brytnee if she would be willing to speak to Amber off the record because they had hoped to meet before the hearing. Brytnee replied to these statements by saying, "The flights have been really crazy, delayed, canceled, so by the time I would have made it there, it would have been after the court date, so I felt this was the most, you know, in-person for me to be here in time." She agreed to speak with Amber on the phone, and the court declared a short recess.

When the hearing resumed, Amber's counsel stated that his client was able to explain what she was willing to commit to for an open adoption, and it may help Brytnee if the court acknowledged the exact terms on the record because Amber intended to "begin to operate in the spirit of that agreement now and not wait until the adoption is finalized." Brytnee stated she agreed with Amber that Amber was an important part of W.M.'s life. She was grateful for Amber and would keep her in W.M.'s life after she was removed from Amber's care.

The juvenile court ruled on the record as follows: "Based on everything that the court has heard not only today but the history including [Brytnee's] numerous attempts and efforts made well before the [section] 366.26 hearing, the court finds that

23

[SSA] has met their burden by a preponderance of the evidence that the proposed removal is in the best interest of the child to be with family.  [¶] I cannot stress how hard this decision has been for this court, and I recognize that this is heartbreaking for [Amber] and will be difficult for [W.M.], but I have to think about her 18 years of life, and that is the court's order."

Amber's counsel stated they planned to file a writ petition.  The court stated it believed the petition must be filed in seven days, and therefore, stayed the order until August 22, 2022.  The court stated that in the meantime it would be a good idea for the parties to arrange contact between W.M. and her maternal family.  SSA stated it would take several weeks to arrange for transportation funding.  The court granted Amber's request to be the person who travels with the child to Virginia for the transfer.  And finally, the court ordered the court reporter to expedite a copy of the transcript for purpose of writ review.

DISCUSSION

As will be described in more detail below, the Legislature has carefully crafted a matrix of statutes to assist SSA and juvenile courts with placement and removal decisions at all stages of dependency proceedings.  Because a child's best interest evolves quickly, the legislators developed a spectrum of *preferences* (relative placement preferences, caretaker preferences, and prospective adoptive parent preferences).  (§§ 361.3, subd. (c), 366.26, subds. (k) & (n).)  These statutorily created preferences are not to be automatically applied and should not be treated the same as evidentiary presumptions.  To the contrary, the statutes discussing each preference require the consideration of multiple factors all dependent on an examination of evidence relating to the minor's current circumstances.  Consequently, a reflexive approach that children are always better off with relatives is incompatible with the governing laws, and as was the issue in this case, often unsupported by the evidence.

24

I. *Applicable Law*

It is well settled that at the beginning of a dependency case, the statutes focus on promoting family reunification, if possible, because in most cases this goal serves the child's best interest. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 672-673.) After the court terminates services, the applicable statutes reflect a shift in policy toward promoting a permanent and stable environment for the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319 (*Stephanie M.*).) The parents' interests "are no longer paramount" and "there is a rebuttable presumption that continued foster care is in the best interest of the child. [Citation.]" (*Id.* at p. 317.) And following termination of parental rights, the statutes become laser focused on quickly facilitating adoption. "The core function of both the agency and the juvenile court after parental rights have been terminated is to ensure the child's *prompt* adoption in a safe, stable, loving home. [Citations.]" (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 46 (*T.W.*).) To foster these variable goals, the Legislature designed three statutory preferences for courts to consider during dependency proceedings.

A. *Relative Preference—Section 361.3*

At the outset of a dependency case, section 361.3, subdivision (a), requires SSA and the court to give "preferential consideration" to a relative's request for placement, which means "the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1) [defining preferential consideration].) The reason for preferential consideration requires little explanation. The trauma of removing a child from their home, and all that is familiar, can be eased by placement with beloved and recognizable relatives who can provide needed comfort. "We all have relatives who we love and feel comfortable with. Most people can imagine that if something had happened to our parents when we were children, we would have wanted to live with family or kin. We can presume that relatives will be the first and most likely source of a good, loving home for children who cannot live with their parents.

25

However, like any presumption, this will not always be the case in reality." (Richard A. Perry, Esq., *Relative Preference, Emotional Attachments, and the Best Interest of the Child in Need of Assistance* (2020) 50 U. Balt. L.F. 83 (hereafter Perry).)

Accordingly, the legislature requires SSA and the court, when assessing any relatives for placement, to consider specific factors described in section 361.3, subdivision (a), "and any other factors the juvenile court may deem relevant to the child's particular circumstances." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 592 (*Maria Q.*).) "In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) [Other Family Code provisions] regarding relative placement. [¶] (4) Placement of siblings and half siblings in the same home . . . . [¶] (5) The good moral character of the relative and any other adult living in the home . . . . [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative" to provide the child with benefits outlined in subdivisions (A) through (I). (§ 361.3, subd. (a)(1)-(7).) Those include providing a safe and caring environment, facilitating reunification efforts with the parents, arranging for visitation with other relatives, securing appropriate child care, and providing legal permanence if reunification fails. (§ 361.3, subd. (a)(7)(A)-(I).)

Despite this long list of evidentiary considerations, the relative placement preference statute is often misstated or misunderstood as operating as an evidentiary presumption in favor of placement with a relative. (*Stephanie M., supra,* 7 Cal.4th at p. 320.) Section 361.3 only expresses "a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Ibid.*)

26

"Application of the preference throughout the reunification period is . . . supported by California's strong public policy favoring the facilitation of family reunification, because relative caregivers are more likely to favor the goal of reunification and less likely than nonrelative caregivers to compete with the parents for permanent placement of the child." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 797 (*Joseph T.*).) Consequently, courts should consider relatives who have come forward after an initial placement with a nonrelative, and SSA can continue to search for relatives during the family reunification period of a case. (*Id.* at p. 795.) For placements determinations after disposition, the statute requires SSA to consider one additional factor: "In addition to the factors described in [section 366.26,] subdivision (a), the county *social worker shall consider* whether the relative has *established and maintained a relationship with the child.*" (*Ibid*; § 361.3, subd. (d), italics added [preference applies "whenever a new placement of the child must be made"].)

Whether to *remove* a child thriving in a placement with nonrelatives to live with relatives is often a difficult and deeply factual question. As noted by one treatise, there is conflicting research about the "benefits of allowing children to be placed with family whenever possible" versus the "benefits of stable, continuous placement." (Seiser & Kumli, Cal. Juvenile Court Practice and Procedure (2021) § 2.127[3], p. 2-499 (hereafter Seiser).) "Until the [L]egislature is able to provide more specific guidance, courts and agencies will continue to struggle with this issue and hand down inconsistent decisions when caregivers and relatives fight over custody. In the meantime, the best remedy is for all parties to do the necessary work upfront. Relatives who come forward in a timely manner who cannot otherwise take immediate placement due to distance or other extenuating circumstances must be immediately identified as the concurrent plan. These relatives must be encouraged by all parties to visit frequently and have regular contact with the children, and expectations must be made clear to the caregivers. Relatives should regularly ask for and receive updates as to the children's well-being and,

27

to the extent allowable, the progress of the case. Similarly, relatives who learn their relatives have been placed in care and who do not come forward for the placement in a timely manner must be prepared to face the reality they may be denied placement." (*Ibid.*)

As aptly stated by the court in *Joseph T.,* "The relative placement preference . . . is not a relative placement *guarantee* [citations]" and in that case "the record contain[ed] ample evidence that the preference was overridden . . . ." (*Joseph T., supra,* 163 Cal.App.4th at p. 798.) It concluded, "The record shows compelling reasons not" to separate two half siblings by placing one with his paternal aunt "regardless of her qualifications." (*Ibid.*) Placing one child with his aunt in a different county away from his mother would frustrate the goals of family reunification, and there was evidence the children were strongly bonded with each other and their foster parents. (*Id.* at pp. 791-792, 798.)

Finally, it is well settled section 361.3 *does not apply* after termination of parental rights. "There is no relative placement preference for adoption." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) Section 361.3 is replaced by the caretaker preference (§ 366.26, subd. (k)) and prospective adoptive parent preference (§ 366.26, subd. (n)). "A placement request by a relative after a permanency hearing is essentially a request to modify the child's permanency plan and must be heard under the statutory framework of sections 366.26 and 366.3." (*Maria Q., supra,* 28 Cal.App.5th at p. 583.)[9]

B. *Caretaker Preference*

"Unlike the relative placement preference, the caretaker preference applies specifically to applications for adoption. [Section 366.26, s]ubdivision (k) provides,

_____

[9] Section 366.3 provides that after a court orders a permanent plan of adoption or legal guardianship, it must frequently review the matter to ensure completion of the permanency plan "as expeditiously as possible" and a court may reopen the case if SSA becomes aware of changed circumstances.

28

'Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child *over all other applications for adoptive placement* if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being. [¶] As used in this subdivision, "preference" means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child.'" (*Lauren R., supra*, 148 Cal.App.4th at p. 855, italics added.)

This preference applies when there are competing adoption applications, even between different relatives. Like the relative placement preference, the statute expressly defines the preference as meaning something different than an evidentiary presumption. The statute also places *the burden on SSA* to make two determinations before processing one adoption application before the others: (1) "the child has substantial emotional ties" to a relative or foster caretaker; and (2) removal from that caregiver "would be seriously detrimental to the child's emotional well-being." (§ 366.26, subd. (k).)

In the *Lauren R.* case, the minor's aunt, who lived out of state, was interested in adopting the pre-teen minor. (*Lauren R., supra,* 148 Cal.App.4th at p. 846.) After several visits together, the minor stated she wanted to be adopted by her caregiver, a nonrelative extended family member. (*Id.* at pp. 846-847.) The aunt and the caregiver both took steps towards adopting the minor. (*Id.* at p. 849.) The court held a "placement review hearing" the day before the scheduled permanency hearing. The court listened to seven days of testimony, including opinions from the minor's therapist who concluded moving the child would be detrimental because she viewed the caretaker as her mother.

29

(*Id.* at pp. 850-851.) Applying the relative placement preference statute, the court placed the minor with her aunt, stating there would be a benefit in forming relationships with "her young blood cousins." (*Id.* at p. 852.) The minor and her caregiver filed writ petitions, arguing neither the court nor SSA complied with the caretaker preference statute, which holds the caretaker was entitled to have her adoption application processed before the aunt's application. (*Id.* at pp. 852-853.) A different panel of this court agreed and granted the petition.

This court acknowledged the minor's aunt requested placement early in the proceedings and she made the undeniable argument the ICPC requirements were "unfair to out-of-state relatives if the relative placement preference can be lost by the passage of time." (*Lauren R., supra,* 148 Cal.App.4th at p. 855.) We explained this predicament did not give SSA or the courts grounds to ignore the caretaker preference statute. "The overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child. '[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests. [Citation.]" (*Lauren R., supra,* 148 Cal.App.4th at p. 855, citing *Stephanie M., supra,* 7 Cal.4th at p. 321.) We remanded the case because "the statute clearly require[ed] SSA to make both" factual determinations listed in the statute and SSA had not done so. (*Lauren R., supra,* at p. 859.)

C. *PAP Preference*

As recently discussed by the Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614, 625, "we rely on *social services and statutory procedures* to strike a

30

delicate balance between protecting children . . . and ensuring the continuity of children's emotionally important relationships." (Italics added.) The court recognized the statute provided a "carefully calibrated process" to "ease the court's difficult task in making" important decisions, such as whether to terminate parental rights. (*Ibid.*) The same holds true for the statute specifically created for the review of SSA's posttermination removal decisions. Section 366.26, subdivision (n), *limits* SSA's authority to remove a child from his or her prospective adoptive parent's home after parental rights are terminated "unless the court finds that r*emoval,*" by a preponderance of the evidence, is in the child's best interest. (Italics added.)

Unlike the caretaker preference statute, which "applies to applications for adoption both before and after the termination of parental rights" (*Lauren R., supra,* 148 Cal.App.4th at p. 859), the PAP preference applies only posttermination. "[T]he Legislature enacted section 366.26[, subdivision](n) 'to strengthen the juvenile court's oversight and to protect the stability of children after parental rights are terminated . . . .' [Citation.] The statute addresses a legislative concern that an unjustified agency action in removing a child from a long-term caregiver might not be in the child's best interest." (*L.M., supra,* 39 Cal.App.5th at p. 910.)

Section 366.26, subdivision (n), became effective in 2006. (Stats. 2005, § 1, ch. 626, p. 4666.) Prior to its enactment, there was no statutory provision that would allow the juvenile court "to override [SSA's] selection of an appropriate foster home for a dependent child. [Citation.]" (*T.W., supra,* 203 Cal.App.4th at p. 44 [prior to 2006, court's review of placement decisions was limited to when the agency abused its discretion].)

Accordingly, "[s]ection 366.26, subdivision (n), represents 'a paradigm shift in the standards to be applied to agency decisions in the narrow category of posttermination removal of children from designated prospective adoptive placements and gives to the court the wide discretion previously afforded the adoption agencies to

31

determine whether the placement is in the best interest of the child.' [Citations.] [¶] In enacting section 366.26, subdivision (n), the Legislature intended to 'limit the removal of a dependent child from his or her caretaker's home after parental rights are terminated, if the caretaker is designated or qualified as a prospective adoptive parent, as defined, in order to "protect the stability and best interests of vulnerable children."' (Assembly Com. on Judiciary, com. on Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended June 2, 2005, p. 5.) The legislation was designed to correct the '"nearly complete, unchecked authority"' appellate courts had given to a child welfare agency to decide a dependent child's adoptive placement after termination of parental rights. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended Apr. 7, 2005, p. 2, citing *In re Harry N.* (2001) 93 Cal.App.4th 1378.)" (*T.W., supra,* 203 Cal.App.4th at pp. 44-45.)

D. *PAP Removal Hearing Procedure*

As mentioned above, because SSA's "core function" posttermination is to expedite adoption (*T.W., supra,* 203 Cal.App.4th at p. 46), the PAP preference statute purposefully delineates a short timeline for the court to review a challenged removal decision. (§ 366.26, subd. (n), Rule 5.727.) Before removing the child, SSA must give notice to specific parties of its decision "as soon as possible." (Rule 5.727(b)(1)-(8).) The list of possible participants includes the court, a qualifying PAP caregiver,[10] and the minor's counsel. (§ 366.26, subd. (n)(3).) The agency "must provide notice on *Notice of Intent to Remove Child* (form JV-323). A blank copy of *Objection to Removal* (form JV-325)" and other forms must also be served on all participants. (Rule 5.727(c), (d).) The date of this notice triggers a five-court-day deadline (or seven calendar days from the date

---

[10] The juvenile court may designate a current caretaker as a PAP if the child has lived with the caretaker for at least six months, and the caretaker currently expresses a commitment to adopt the child and has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)

of notification) for parties wishing to object, and the court must set a hearing regarding SSA'a proposal "as soon as possible and not later than five court days" unless it is unable to do so. (§ 366.26, subd. (n)(3)(A); Rule 5.727(e).) In short, the court's review of SSA's decision should take no more than a few weeks.

"At a hearing on an intent to remove the child, *the agency intending to remove the child must prove by a preponderance of the evidence* that the proposed removal is in the best interest of the child." (Rule 5.727(g), italics added.) Parties requesting a review of the court's order after the hearing must file a writ petition following rules 8.454 and 8.456. "A juvenile court's decision to authorize a change in the minor's placement is reviewed for abuse of discretion. [Citation.] But we must also review the juvenile court's finding that the change is in the minor's best interests to determine whether there is substantial evidence in the record to support it." (*In re M.M.* (2015) 235 Cal.App.4th 54, 64 (*M.M.*).) "Under the substantial evidence standard of review, an appellate court reviews the record in the light most favorable to the trial court's findings. [Citation.] "'"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" [Citation.] We may not reweigh or express an independent judgment on the evidence." (*L.M., supra,* 39 Cal.App.5th at pp. 913-914.) Nor will we disturb a juvenile court's custody determination unless it exceeds the limits of legal discretion. "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'" (*Stephanie M.*, *supra,* 7 Cal.4th at pp. 318-319.)

II. *Analysis*

A. *Initial Observations*

We were dismayed to read SSA's report stating HDSS did not receive Brytnee's ICPC application until February 23, 2022, nearly eight months after she requested placement. In the end, Brytnee's ICPC took nearly one year to be approved.

33

The record does not explain who specifically was at fault for this excessive delay. Needless to say, the error was unacceptable and at odds with the *best interest* goals of these highly time-sensitive cases. Although the juvenile court and counsel appropriately exhibited frustration and anger caused by the extraordinary delay, the record does not reflect that anyone was particularly surprised. We are troubled by the court's concern that there was a danger an ICPC would be intentionally delayed to bypass the relative placement preference. The court stated, "Relative placement is in the law for a reason, so to argue now that too much time has passed through no fault of [Brytnee] seems like a circular argument. [¶] Why wouldn't the agency or anyone else who doesn't . . . support relative placement delay a matter for 6-, 12-, 18 months and then argue too much time has passed?" We implore SSA to take immediate steps to remedy whatever problem caused an ICPC application to take over a year to complete.

We also find troubling SSA's apparent lack of understanding of its duty posttermination, as plainly set forth in section 366.26, subdivision (n). As noted earlier in the opinion, SSA was required to alert participants "as soon as possible after a decision is made to remove a child" using form JV-323, to ensure any challenges would be immediately considered and quickly resolved. (§ 366.26, subd. (n)(3), rule 5.727 [review process should take approximately two weeks].) We appreciate SSA does not frequently remove children from their designated PAPs, but these are not new legal notice requirements.

SSA did not use form JV-323, and it is unclear from this record if the agency timely notified all the correct parties. The record reflects the social worker received Brytnee's approved ICPC on May 23, 2022, and *verbally notified* Amber of the agency's decision to remove W.M. 10 days later (on June 2, 2022). Amber filed an objection several weeks later (on June 28, 2022). A few weeks thereafter, on July 18, 2022, SSA finally notified the juvenile court in writing of its plan to remove W.M. from her placement with her PAP (56 days after receiving the approved ICPC).

34

SSA's means of notification were inadequate.  It submitted to the juvenile court a document titled "Ex parte—Information Only," which recited several facts.  Noticeably missing from the discussion was any analysis of why SSA determined removal was needed or was in W.M.'s best interest, when SSA made the proposed decision, or whether it properly and timely notified all the parties as required by the statute.  Given that this case had already been extended long past the statutorily recommended deadlines for newborns (§ 361.5, subd. (a)(1)(A)-(B)), and SSA was aware of the many delays processing Brytnee's ICPC, we are puzzled as to why SSA would not carefully follow the statutory notice requirements to expedite resolution of the matter.

The court scheduled the section 366.26, subdivision (n), hearing for August 12, 2022, which was 45 days after Amber filed her objection instead of the five days required by the statute.  August 12, 2022, also marked three-months to the date that the court freed W.M. for adoption.  On that day, Amber, with SSA's encouragement and support, was given the green light to continue forward with the last steps in the adoption process.  SSA's decision to remove W.M. from Amber's care at this point would be understandable if there had been some sort of emergency.  (See, e.g., *T.W., supra,* 203 Cal.App.4th at p. 45.)  The only reason offered by SSA was a belated approval of Brytnee's ICPC.

There are only a handful of cases addressing the juvenile court's review of an agency's removal decision posttermination.  Of these cases, the ones affirming the court's *approval* of SSA's proposed *removal* look much different than the one now before us.  First, they contain lengthy discussions of the quantity and quality of SSA's evidence, presented at the hearing to support its removal decision.[11]  Second,

---

[11]     The appellate cases reviewing posttermination removal orders have in common hearings lasting multiple days due to the quantity of evidence presented.  (See, *L.M., supra,* 39 Cal.App.5th at p. 901 ["five days of evidence including expert testimony"]; *T.W., supra,* 203 Cal.App.4th at p. 37 [four-day hearing including minor's

35

consideration of the child's current circumstances always includes evidence showing an established connection to someone at the proposed placement and evidence continuation of the relationship was in the child's best interests. Third, the records reflect deliberate consideration of the PAP-child bond. All the above was missing in this case.

B. *SSA's Burden to Justify Removal Plans*

As noted above, because the hearing concerned a challenge to SSA's decision, the agency had the burden of proving "by a preponderance of the evidence that the proposed removal is in the best interest of the child." (Rule 5.727(g).) After carefully reviewing the record, we conclude SSA failed to meet its burden and perhaps was confused about how its burden of proof changed depending on what statutory preference was at issue posttermination.

If the court had been considering whether W.M.'s *placement* with a particular relative would be appropriate, SSA would have satisfied its obligation by submitting Brytnee's approved ICPC and evidence relevant to factors listed in section 361.3. However, SSA had a higher burden of proof posttermination because its removal plan conflicted with the statutory preference of maintaining a child's stability and permanency with her PAP. To assist the court in reviewing SSA's proposed removal plan, SSA needed to present evidence regarding W.M.'s current circumstances, which would include updated reports on the status of her relationships with the PAP, Brytnee, and any person relevant to her best interests. (See, *L.M., supra,* 39 Cal.App.5th at p. 915 [approved removal to biological sister's home because evidence 10-month-old minor bonded to sister and had positive relationship with the family]; *M.M., supra,* 235 Cal.App.4th at p. 64 [no evidence to support removal from PAP, and 13-month-old minor's only home, in favor of relative who minor visited six times].)

---

therapist]; compare *M.M., supra,* 235 Cal.App.4th 54 [reversed and remanded due to court's failure to hold an evidentiary hearing and summarily ordering removal].)

36

The delayed resolution of Brytnee's ICPC did not transform the question of removal into a simple placement question. As explained in *T.W.,* "'[W]e look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law.' [Citation.] The words 'removal' and 'placement' have different meanings and we presume the Legislature did not intend to use them interchangeably. [Citation.]" (*T.W., supra,* 203 Cal.App.4th at p. 45.) In that case, the court determined a child's emergency removal from a PAP's home "did not transform removal under section 366.26, subdivision (n), into a placement." (*Ibid.*) The court held section 366.26, subdivision (n)'s procedures *must be followed anytime* a child's caregiver is a PAP and parental rights have been terminated. (*Ibid.*)

SSA's misunderstanding regarding its burden of proof is evident from county counsel's statements at the hearing and SSA's complete reliance on the ICPC as providing sufficient grounds to remove W.M. from her PAP. It is concerning that the social worker's ex parte notification of the removal plan offered no insight into SSA's decision other than there was a delay in obtaining the ICPC. At the hearing, when the juvenile court asked for county counsel's input, she responded the court understood "the impossible situation . . . the agency was in" and the case "could not have been resolved with a simple risk assessment." She added, SSA's position "as far as risk is concerned is that we have found two appropriate homes." Evidence Brytnee's home was rated *appropriate* by the ICPC report satisfies relative *placement* preference factors. (§ 361.3, subd. (a)(7).) However, at this stage of the case, the conclusion both homes were appropriate did not allow the court to just choose one without further inquiry. To justify its removal decision, SSA needed evidence proving Brytnee was not only an appropriate relative placement but also *a more suitable adoptive home* than the one SSA previously designated the preferred adoptive home (with a PAP). The PAP preference, like the relative preference, is there for good reason.

37

However, SSA did not present evidence regarding the nature of Brytnee's relationship with W.M.  Shockingly, county counsel confirmed the information Amber presented about Brytnee's sporadic and limited contact with W.M.  She stated, "The agency does confirm the information . . . that [Brytnee's contact] was intermittent at the beginning, that there has been some lapse in the middle, that there was no FaceTime sought or no in-person visitation."  Making matters worse, she suggested any alleged failure to FaceTime with W.M., or visit in person, was excusable because Brytnee lived out of state.  This is not a reasonable explanation when we live in a world of readily available technology, designed to help us connect with loved ones (put to the test during the COVID19 pandemic).  The lack of evidence is concerning because although the nature and duration of a relative's relationship with the child is only one of many important factors for application of the relative placement preference (§ 361.3, subds., (a)(6) & (d)), it could be the decisive factor in whether a court should approve the minor's removal from the *statutorily preferred* PAP.

At the hearing, county counsel did not refer to any evidence she believed supported SSA's plans to send W.M. away from the only family she has known, to live with blood relations who are strangers to her.  County counsel also mistakenly stated the PAP preference statute placed the burden on the court, not SSA, to evaluate W.M.'s best interests in the first instance.  As will be explained in more detail below, this combination of errors led to an incomplete picture of W.M.'s current circumstances and there was nothing to reasonably support SSA's determination removing W.M. from Amber's home was in the child's best interest.

C.  *W.M.'s Current Circumstances*

To assist the court in deciding whether to approve or disapprove of SSA's removal plans, a court must consider evidence regarding all facets of the child's current circumstances, which would include the child's foreseeable future relationships.  (*L.M., supra,* 39 Cal.App.5th at p. 911 [court properly considered child's proposed placement

38

with her sibling].)  The *L.M.* case is instructive because the court clarified the statutory PAP preference does not limit juvenile courts to evidence relating to the harm created by a child's removal from the PAP's home.  (*Ibid.*)

In the *L.M.* case, the court considered testimony during a five-day hearing from several witness and experts connecting the child's existing relationships to her best interest in an adoptive home.  The social services agency established the child visited her sister monthly during the dependency case and enjoyed overnight visits in the proposed new placement.  (*L.M., supra,* 39 Cal.App.5th at pp. 904-905.)  By all accounts, the sister's family members were excellent caregivers, and the sisters were attached to each other.  (*Ibid.*)  A psychologist testified she observed the child's interactions with her sister and the family and there was no concern a transition to that family would cause any trauma.  (*Id.* at p. 905.)  A social worker explained that due to the contentious relationship between the two families, the sisters would never get to see each other again and it was in the child's best interest to grow up with someone that shared her biology, culture, and race.  (*Ibid.*)

Offering a counter viewpoint, the PAPs presented evidence demonstrating their strong family bond with the child.  (*L.M., supra,* 39 Cal.App.5th at pp. 905-906.)  They made it a priority for the child to frequently visit her paternal grandmother who lived nearby, and they believed she would benefit from maintaining this relationship.  (*Ibid.*)  The case manager and a psychologist testified the child would suffer trauma if removed from the PAPs due to their significant bond.  (*Id.* at p. 906.)

After considering this mountain of evidence, the court concluded SSA's psychologist's opinion was the most credible.  (*L.M., supra,* 39 Cal.App.5th at p. 908.)  It also found highly persuasive the social worker who had observed the child and opined removal was in her best interest because the sisters were close in age and the same race, while there was a "'significant generational difference'" between the child and her grandmother.  (*Id.* at p. 907.)  The court discussed the PAP's evidence, concluding their

relationship with the child was compelling but based on "the overall picture" and benefit of maintaining the sibling bond, removal was in the child's best interest. (*Id.* at p. 908.)

Thus, a child's current circumstances will include not only his or her emotional connection with the PAPs but also his or her relationship to the proposed new placement. "[I]n deciding what is in the child's best interest, the court properly considers the long-term nurturing and growth of the child, as well as the child's future physical, mental, and emotional needs. [Citation.] In this sense, the best interest standard is necessarily forward looking." (*L.M., supra,* 39 Cal.App.5th at p. 911.)

Our record looks much different from the *L.M.* case due to SSA's failure to present new evidence about W.M.'s current circumstances (other than the belatedly approved ICPC). On the other hand, Amber, like the PAPs in the *L.M.* case, presented ample evidence of W.M.'s strong emotional attachment to the person she psychologically viewed as her mother. Amber was the only parent W.M. has ever known because Mother was denied services and Father failed to participate for the brief time he was offered visitation (ending in August 2021). There was also evidence W.M. was bonded to other members of Amber's household, who had happily taken on the roles of an adoring older sister and a loving grandmother. Minor's counsel referred to the evidence of W.M.'s significant attachment to Amber as being the primary reason she objected to SSA's proposed removal plan. Amber presented evidence indicating separation would be traumatic for W.M., who had learned to depend on the PAP for her daily needs, comfort, unconditional love, and safety. Neither minor's counsel nor the PAP submitted expert testimony, but as will be explained, Brytnee and SSA do not dispute the depth of the W.M.'s relationship with her PAP. SSA could have presented evidence that removal would not have been emotionally detrimental to W.M., but it failed to do so. The silence speaks volumes.

Other evidence relevant to the question of W.M.'s best interest, but not discussed by SSA or the juvenile court, was Amber's commitment to giving W.M. the

40

opportunity to develop connections with her biological sisters who lived nearby. Amber stated she understood the importance of facilitating sibling bonds, and the other adoptive parents indicated a willingness to help Amber.[12] We can think of no reason why the importance of fostering W.M.'s sibling bonds was less desirable than establishing a relationship with more distant blood relatives (aunts and cousins). Which brings us to the significance of the evidence regarding Amber's efforts to arrange for an open adoption so that Brytnee, Grandmother, and the distant relatives in Virginia, would be incorporated into W.M.'s life. Amber suggested weekly video visits and arranging for multiple in-person visits each year. Amber appeared intent on establishing not only new sibling bonds for W.M., but also long-lasting connections with all her relatives. In contrast, Brytnee did not offer to visit or establish contact with W.M.'s siblings or seriously include Amber's family in W.M.'s future life. She offered pictures.

Brytnee presented very little evidence at the hearing, leaving unanswered many questions about her level of commitment to W.M. or whether she truly appreciated the depth of the child's emotional attachment to Amber. Brytnee testified W.M. had multiple aunts and cousins close to her age in Virginia, and the cousins were excited to meet W.M. Brytnee did not mention information included in the HDSS report that no other children resided with her and Grandmother. She did not discuss her childcare plans for W.M. while working full time as a flight attendant. If Grandmother intended to help with raising W.M., why did her efforts to gain placement fail in the other cases

---

[12]     Our record is unclear about whether the siblings had actually met each other yet. This would have been a good question for SSA to have asked as part of its duty to evaluate W.M.'s current relationships.

concerning W.M.'s siblings?[13]  Mother and Father both suggested Grandmother as a relative placement, but not Brytnee.  (See § 361.3, subd. (a)(2) [relative preference factors include parents' wishes].)

Brytnee asserted she and her extended family already loved W.M. based on photographs.  We understand Brytnee did not have the benefit of counsel at the hearing, but Brytnee never addressed the elephant in the room, i.e., her failure to contact W.M. for over one year (in person or virtually).[14]  Sending five text messages and some photographs to W.M.'s caregiver over a one-year period required minimal effort. Brytnee's failure to seek out any relationship with the child she wanted to have placement with, and later wanted to adopt, demonstrated a lack of understanding of the child's ability to form strong bonds at an early age and calls into question her parenting skills.

---

[13]  As mentioned in our factual summary, early in the case Mother stated she gave up on her court case plan to reunite with W.M.'s two sisters because those children were *removed* from Grandmother's care.  Grandmother told the social worker she "made efforts" to have the children placed in her care "through an ICPC."  The record is silent as to whether the children were placed with Grandmother and later removed, or if SSA decided not to place the children with her.  Either way, before recommending W.M. live with Brytnee and Grandmother, SSA should have considered who would care for the child while Brytnee was working.

[14]  It is unfortunate the social workers did not assist Brytnee earlier in the case. While waiting for ICPC approval, SSA could have explained how the relative placement factors outlined in section 361.3 would increase her chances of a future placement.  We found nothing in the record suggesting SSA encouraged Brytnee or Grandmother to visit or have regular contact with W.M.  Having lived through the recent COVID-19 lockdown, SSA should have been acutely aware of the advantages gained through virtual visitation, when in person contact is not possible.  There is ample research supporting, and recent case law discussing, the benefits derived (even for infants) from frequent, consistent, and interactive virtual visitation. (See Casey Family Programs, *Questions from the field:  What are child protection agencies learning about support virtual engagement with children and families as well as staff?*  (Apr. 7, 2022) <https://www.casey.org/virtual-engagement-covid/> [as of Dec. 16, 2022], archived at: <https://perma.cc/ https://perma.cc/T5XG-42TT> [how best to support virtual engagement and incorporate virtual visitation in future cases to support children and families].)

As pointed out by Amber's counsel, Brytnee's ability to care for W.M. was untested. Brytnee had not been assessed for adoption, only for relative placement. She was not an experienced parent with a history of making good parenting decisions.

Amber submitted uncontroverted evidence calling into question Brytnee's level of commitment. Brytnee did not refute Amber's statement that in August 2021 she asked to check in weekly with Amber to inquire about W.M.'s well-being. Brytnee did not follow through with this plan. Nor did Brytnee explain why she sent so few messages to Amber or why she stopped sending text messages at the end of 2021. The HDSS report stated Brytnee was open to providing permanency "in the distant future," which differed from Brytnee's statements at the hearing. No one asked Brytnee to explain this discrepancy. It goes without saying that any further delays in permanency and a stable home would not be in W.M.'s best interest. In light of the above, the evidence firmly established W.M.'s current circumstances included a long-term significant bond to Amber's family and absolutely no connection to Brytnee or Grandmother. Although blood relatives, they were strangers to her.

In *M.M., supra,* 235 Cal.App.4th at page 64, the court vacated the court's order approving SSA's removal decision, concluding the minor barely knew her aunt, who merely offered an appropriate placement. The court concluded a blood relative's approved home was insufficient evidence to prove removal was in the minor's best interest, particularly when there was evidence the minor had lived with the PAP all her life. (*Ibid.*) The court concluded there "was simply no evidence" to support the court's approval of SSA's plan. (*Ibid.*) "There was absolutely no consideration of the impact of removal on the minor, despite evidence that the minor was showing stranger anxiety and looked to [the PAP] to meet her needs." (*Ibid.*)

D. *Consideration of the PAP-Child Bond*

The importance of this last inquiry was discussed at length in the statute's legislative history: "'There may be a number of reasons why the . . . agency may wish to

43

remove the child from the caretaker's home and place him or her in another home, such as . . . the home of another set of prospective adoptive parents who appear to be more suitable for the adoption . . . . [¶] 'However, [Senate Bill No.] 218 recognizes that there could be reasons why a child should not be removed from a caretaker's home, and those reasons could amount to removal not being in the best interest of the child. Therefore, rather than have the child *removed and placed elsewhere first*, pending a review of the department's decision which could only be challenged using an abuse of discretion standard, this bill would establish a notice and hearing procedure *prior to removal*.' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended Apr. 7, 2005, p. 6, italics added.)" (*L.M., supra,* 39 Cal.App.5th at p. 912.)

It is difficult to ignore the multiple reports, filed during the course of this action, fully supporting Amber's adoption efforts. From the beginning of this case, the social workers have repeatedly described how Amber (a pre-approved resource family) and W.M. quickly formed a significant emotional attachment. During the reunification period, Amber had proven herself to be a loving and caring mother, who adored and doted on W.M., but also kindheartedly assisted Father. SSA's reports consistently identified Amber as the prospective adoptive parent and made little mention of Brytnee. SSA was well aware of the many steps Amber had taken in the process required to adopt W.M. and did nothing to dissuade her. Indeed, the permanency hearing report focused on all the reasons SSA supported, and approved of, Amber's efforts to adopt W.M. Consequently, SSA's removal decision was an abrupt departure from the status quo. And while there can be reasons and the need for an emergency removal of a child from a PAP posttermination, those cases are rare and amply supported by evidence. The only explanation we can discern for the abrupt change of course taken in this case is a reflexive type of decision, reminiscent of an outdated and simplistic "'there is a relative, there [the] child goes' approach." (Perry, *supra*, p. 103.)

44

The applicable statute (§ 366.26, subd. (n)) clearly states there is a preference in favor of keeping a child with caretakers in the process of adopting them unless something about the minor's current circumstances warrants their removal to a different home. SSA mistakenly applied factors considered in a temporary relative placement to a determination of which person would be the better adoptive placement. Although SSA argues relative placement was not the basis for the court's decision, the record is clear SSA relied on this preference when asking the court to approve the removal. The benefits of *family* was the only basis articulated by the court during the hearing. The juvenile court was also clearly upset by the extraordinarily long ICPC delay and how a faulty bureaucratic system frustrated the goals of the relative placement preference.

The combination of errors and the ICPC delay are truly unfortunate. We agree Brytnee should not be blamed and it is regrettable that there is no remedy for her heartache. (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1308 ["[m]eaningful redress for past mistakes may not be possible" and "we cannot unwind the clock"].) However, this case is not about whether Brytnee deserves another chance to bond with W.M. or whether her right to placement was wrongfully sabotaged earlier in the case. "The overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child." (*Lauren R., supra,* 148 Cal.App.4th at p. 855.) There was simply no evidence to support the juvenile court's approval of SSA's decision to separate W.M. from the family she loves and who are in the process of adopting her (and willing to foster connections with her siblings). The PAP preference was enacted to expedite adoptions with PAPs and limit children having to start over in homes they have never visited with caregivers they will not recognize.

E. *SSA's Briefing*

On a final note, SSA's briefing contained multiple faulty arguments. For example, county counsel asserted W.M. and Amber claimed the court abused its

discretion by not applying the caretaker preference. (§ 366.26, subd. (k).) Not so. Neither petition cited to the caretaker preference. Amber's briefing (which W.M. joined) focused on the procedures and burdens outlined in the PAP preference. (§ 366.26, subd. (n).)

County counsel also improperly advocated for shifting the burden to the party opposing its removal decision. It made the following argument: "[A]lthough [SSA] does not quarrel with Amber's presentation of the law, SSA urges this [c]ourt deny the petitions, as there is no evidence the child will suffer serious detriment to her emotional wellbeing should she be removed . . . ." (Fn. omitted.) A finding of detriment is one of the determinations SSA must make in applying the caretaker preference statute (§ 366.26, subd. (k)), which is not applicable to this case. It is not an element of the PAP preference. SSA had the burden of proving removal would not cause W.M. to suffer trauma. (Rule 5.727(g).) We are unclear why SSA remained silent on the issue of detriment, but it cannot be heard to complain now there was not enough evidence of it.

County counsel also misstated the issue presented in this case. It argued, "the court had wide latitude to make a discretionary placement order it found was in the best interest of the child. The court's decision to place the child with an approved relative does not exceed all bounds of reason and should not be disturbed." (Fn. omitted.) However, the juvenile court was not *making* a placement order; it was *reviewing* SSA's removal plan. The juvenile court's discretionary decision to approve the removal of a child from his or her placement with a PAP cannot be upheld if there is not substantial evidence to support the ruling.

On the issue of W.M.'s best interest, counsel argued that although W.M. "does appear to have 'substantial emotional ties' to Amber and her daughter . . . SSA asserts there is insufficient evidence that removal from Amber would cause the child irreparable harm." Again, this is an incorrect statement of the burden of proof at the hearing and also misstates the record. Amber presented evidence W.M. would suffer

46

harm, and SSA did not refute this with any contrary evidence. "Human beings are defined largely through their attachments and bonds with others. . . . These attachments and emotional bonds should be valued and safeguarded by the child welfare system." (Perry, *supra,* at p. 83.) SSA could have presented evidence removal would not have caused W.M. significant trauma, but in this case it elected not to.

## DISPOSITION

W.M's and Amber's petitions for extraordinary writ are granted. We vacate the court's order approving SSA's removal decision. Any further delays in W.M.'s adoption by Amber would not be in the child's best interest. Unless W.M.'s circumstances have changed dramatically while this matter was pending, we invite the parties to stipulate to an immediate remittitur (rule 8.272(c)(1)) and to expediate W.M.'s adoption proceedings with Amber.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


GOETHALS, J.

47